**AMERICAN IMMIGRATION LAWYERS ASSOCIATION, et al., Appellants,**

**v.**

**Janet RENO, Attorney General of the United States, et al., Appellees.**

**Nos. 98–5463, 98–5464 & 98–5466.**

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 17, 1999.

Decided Jan. 11, 2000.

J.J. Gass argued the cause for appellants. With him on the briefs were Judy Rabinovitz, Roderic V.O. Boggs, Robert Rubin, Robert E. Juceam, David I. Gelfand, and Karen T. Grisez. Adelia S. Borrasca and Jerome G. Snider entered appearances.

Nancy L. Perkins was on the brief for amicus curiae The Lawyers Committee for Human Rights.

Michele E. Beasley was on the brief for amicus curiae Women's Commission for Refugee Women and Children.

Linda S. Wendtland, Attorney, U.S. Department of Justice, argued the cause for appellees. With her on the briefs were David W. Ogden, Acting Assistant Attorney General, Donald E. Keener, David J. Kline, Ellen Sue Shapiro, and Teresa A. Wallbaum, Attorneys.

Before: GINSBURG, HENDERSON, and RANDOLPH, Circuit Judges.

Opinion for the Court filed by Circuit Judge RANDOLPH.

RANDOLPH, Circuit Judge:

The Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), Pub.L. No. 104–208, 110 Stat. 3009, established a system for expediting the removal of aliens who arrive at the border but are not eligible for admission. Congress permitted judicial review of the new system, but set a deadline: all actions had to be "filed no later than 60 days after the date the challenged section, regulation, directive, guidance, or procedure ... is first implemented."[1] 8 U.S.C. § 1252(e)(3)(A)-(B). Ten organizations

and twenty aliens, some added after the deadline expired, brought constitutional, statutory, and international law challenges after the Attorney General issued regulations under the new law. The district court disposed of the cases mainly on jurisdictional grounds, although it did reject the claims of two of the alien plaintiffs on the merits. *See American Immigration Lawyers Ass'n v. Reno*, 18 F.Supp.2d 38 (D.D.C.1998). We hold that the organizational plaintiffs lacked standing to litigate the rights of aliens not parties to the lawsuits and that the judgment of the district court should be affirmed in all other respects.

I

A

Every person who arrives at a United States port of entry undergoes primary inspection during which immigration officers review the individual's documents. In fiscal year 1996, the Immigration and Naturalization Service conducted 475 million primary inspections. 62 Fed.Reg. 10,312, 10,318 (1997). Returning citizens produce their passports; aliens must show a valid visa or other entry document. If the immigration officer is unable to verify an alien's admissibility, the alien is referred to secondary inspection for a more thorough examination of eligibility to enter.

Before IIRIRA, if immigration officials could not verify an alien's admissibility at secondary inspection, the alien was entitled to defend his eligibility at an exclusion hearing before an immigration judge. *See* 8 U.S.C. §§ 1225(b), 1226(a) (1994). The alien had the right to counsel at the hearing, *id.* § 1362(a), could examine witnesses, *id.*, and was provided with a list of persons providing free representation, 8 C.F.R.

---

**1.** 8 U.S.C. § 1252 provides the exclusive jurisdictional basis for challenging the removal procedures: "Except as provided in this section and notwithstanding any other provision of law, no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under this Act." 8 U.S.C. § 1252(g).

§ 236.2(a) (1994). If the ruling were adverse, the alien could appeal to the Board of Immigration Appeals and, ultimately, federal court. *See* 8 U.S.C. §§ 1105a(b), 1226(b) (1994).

IIRIRA reformed the secondary inspection process in order to "expedite the removal from the United States of aliens who indisputably have no authorization to be admitted...." H.R. CONF. REP. NO. 104–828, at 209 (1996). To that end, the statute provides that "if an immigration officer determines that an alien ... is inadmissible" because the alien possesses fraudulent documentation, *see* 8 U.S.C. § 1182(a)(6)(C), or has no valid documentation, *see id.* § 1182(a)(7), "the officer shall order the alien removed from the United States without further hearing or review...." *Id.* § 1225(b)(1)(A)(i). An alien removed for these reasons is barred from reentry for a period of five years. *Id.* § 1182(a)(9)(A)(i).

The statute exempts from immediate removal aliens who "indicate[ ] either an intention to apply for asylum ... or a fear of persecution." *Id.* IIRIRA directs immigration officers to refer such aliens to an interview with an asylum officer. *See id.* § 1225(b)(1)(A)(ii). If the asylum officer "determines that an alien does not have a credible fear of persecution, the officer shall order the alien removed from the United States...." *Id.* § 1225(b)(1)(B)(iii)(I).[2] Upon the alien's request, an immigration judge will review the removal decision. *See id.* § 1225(b)(1)(B)(iii)(III). The alien is given an opportunity to be heard and questioned in an expedited proceeding: "the review

shall be concluded ... to the maximum extent practicable within 24 hours, but in no case later than 7 days after the [asylum officer's] determination...." *Id.* If the immigration judge overturns the asylum officer's finding, the alien is given a hearing under 8 U.S.C. § 1229a. If the immigration judge affirms the asylum officer's finding, the alien is subject to summary removal.[3]

### B

The Attorney General issued Interim Regulations, effective April 1, 1997, setting forth procedures implementing the summary removal system. *See, e.g.,* 8 C.F.R. §§ 208.30, 235. This started the statutory time limit for judicial review running. Any action challenging the statute or the Interim Regulations had to be filed no later than sixty days after April 1. *See* 8 U.S.C. § 1252(e)(3)(B). Organizations who represent and assist aliens seeking to enter the United States filed two complaints challenging IIRIRA and the Interim Regulations as they apply to asylum-seeking aliens.[4] The cases—*American Immigration Lawyers Ass'n (AILA)* and *Liberians United for Peace and Democracy (LUPD)*—were consolidated. A few of the same organizations joined with the Dominican American National Foundation (Miami area) and aliens to assert claims against the summary removal system as it applied to non-asylum seekers. This third case— *Wood*—focused on determinations, at the secondary inspection stage, that aliens lacked proper documentation. The *AILA* and *LUPD* complaints challenged the same stage of summary removal, but also focused on the "fear of persecution" deter-

---

**2.** If the asylum officer finds that there is a credible fear of persecution, the alien is given a full hearing under 8 U.S.C. § 1229a.

**3.** At this juncture, habeas corpus review on a limited number of issues is available. *See id.* § 1252(e)(2).

**4.** The organizations, each of which is an appellant, are the American Immigration Lawyers Association, a 4500 member association of immigration lawyers, and the following

groups which assist either particular nationalities of aliens or aliens arriving in a particular area of the United States: Florida Immigration Advocacy Center; Human Rights Project (Los Angeles area); Liberians United for Peace and Democracy; National Coalition for Haitian Rights; New York Immigration Coalition; Northern California Coalition for Immigration Rights; World Tamil Coordinating Committee; and Washington Lawyers' Committee for Civil Rights and Urban Affairs.

mination and the procedures available to asylum seekers. In the *Wood* case, an amended complaint filed on August 28 added individual plaintiffs who were removed after the sixty-day deadline. The district court consolidated the *Wood* and *AILA/LUPD* cases.

The complaints raised a host of contentions. Some plaintiffs claimed that IIRIRA violated the due process and equal protection rights of aliens seeking to enter the United States, that the Attorney General's regulations were not consistent with IIRIRA, and that summary removal violated international treaties protecting children and refugees. Plaintiffs rested their due process and statutory claims on the following allegations: the summary removal procedures banned communication with family, friends, or attorneys; failed to notify aliens of the reasons for removal and the procedures available for challenging removal; failed to provide adequate language interpretation; and limited review of removal decisions. Plaintiffs also challenged the procedures as applied to specific individual plaintiffs, claiming that immigration officials were not following IIRIRA or the Interim Regulations. The only claim asserted on behalf of the organizations in their own right was that the First Amendment entitled their members to have access to persons subject to summary removal procedures.

The district court dismissed each of the complaints. With respect to individuals who missed the statutory deadline, the court dismissed for lack of jurisdiction, pursuant to Federal Rule of Civil Procedure 12(b)(1). Two remaining individual plaintiffs—Perlina Perez and Flor Aquino

de Pacheco, both non-asylum seekers— filed within the sixty-day window, but the court dismissed their claims for failure to state a cause of action, under Federal Rule of Civil Procedure 12(b)(6).[5] *See* 18 F.Supp.2d at 46–47, 52–60. The court found that the Attorney General's regulations actually provided more procedural safeguards than the statute required, *id.* at 52–57, that the individuals did not have sufficient contacts with the United States to invoke due process rights, *id.* at 58–60, and that they failed to make the *prima facie* case of discrimination necessary for their equal protection challenge, *id.* at 60.[6] With respect to the validity of the regulations "as applied" to these plaintiffs, the court held that IIRIRA provided review only for written procedures and thus there was no jurisdiction to challenge the particular practices of immigration officials.[7] *Id.* at 57–58 (citing 8 U.S.C. § 1252(e)(3)(A)).

As to the organizational plaintiffs, the district court recognized, and the government conceded, standing for their First Amendment claim. *See* 18 F.Supp.2d at 50. The court rejected that claim on its merits. *See id.* at 60–62 (citing *Ukrainian-American Bar Ass'n v. Baker,* 893 F.2d 1374 (D.C.Cir.1990)). With regard to the other claims, the court found that the organizations alleged "speculative" injuries and did "not meet the causation and redressability requirements" of Article III standing. *See* 18 F.Supp.2d at 49–50.

II

A

As the cases now stand, we have appeals by the individual aliens who filed late and

---

5. Plaintiffs did not challenge the constitutionality of the sixty-day limit, 18 F.Supp.2d at 47 n. 8, perhaps in recognition of the longstanding principle that determining the conditions governing the admission of aliens is "so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference." *Bruno v. Albright,* 197 F.3d 1153 at 1159 (D.C.Cir. 1999) (quoting *Harisiades v. Shaughnessy,* 342 U.S. 580, 588–89, 72 S.Ct. 512, 96 L.Ed. 586 (1952)).

6. Perez and Aquino appeal only the dismissal of their statutory claims. *See* Opening Brief of Plaintiffs–Appellants at 14.

7. The district court did not reach the international law claim because it found that neither the "organizational [n]or individual plaintiffs have standing to assert the International Law claim." 18 F.Supp.2d at 52 n. 14. The plaintiffs' brief does not discuss standing under the treaties, so we do not consider this ruling.

for that reason had their claims dismissed, and by the two non-asylum seekers (Perez and Aquino) who filed timely but lost for failure to state a cause of action. We see no reason to disturb the district court's analysis, and so we affirm the dismissal of these claims substantially for the reasons stated in the court's thorough opinion. *See* 18 F.Supp.2d at 46–47, 52–60.

■ As to the organizational plaintiffs, they have not pressed their First Amendment claim on appeal. This leaves only their contentions that the new system violates, not their rights or the rights of their members, but the constitutional and statutory rights of unnamed aliens who were or might be subject to the statute and regulations. In discussing why they do not have prudential standing to litigate these claims, we will not distinguish between the organizations and their members. *See Hunt v. Washington State Apple Adver. Comm'n*, 432 U.S. 333, 342–43, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977). The district court rightly observed that, with one exception, the organizations and their members alleged identical injuries. The court rejected as too speculative the one injury asserted for associational standing but not for organizational standing—the claim that members of the associations might some day be subject to summary removal. *See* 18 F.Supp.2d at 51. We agree with the court's conclusion and will say no more on that subject.

B

■ Each of the organizational plaintiffs seeks to vindicate the rights of unnamed third parties—namely, aliens who have been or will be processed pursuant to the new law and regulations.[8] Yet one of the "judicially self-imposed limits on the exercise of federal jurisdiction" is "the general prohibition on a litigant's raising another person's legal rights." *Allen v. Wright*, 468 U.S. 737, 751, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984). The district court, though holding that the individual plaintiffs could not assert the rights of third parties, *see* 18 F.Supp.2d at 47, did not directly address third party standing with regard to the organizational plaintiffs. Instead, the court discussed the "zone of interests" test, an aspect of prudential standing distinct from third party standing. *See id.* at 47–49. The zone of interest test looks at the nature of the claims asserted; third party standing focuses on who is asserting the claim and why the holder of the asserted right is not before the court. *Compare Campbell v. Louisiana*, 523 U.S. 392, 397–400, 118 S.Ct. 1419, 140 L.Ed.2d 551 (1998), *with National Credit Union Admin. v. First Nat'l Bank & Trust Co.*, 522 U.S. 479, 488–99, 118 S.Ct. 927, 140 L.Ed.2d 1 (1998). Satisfying the "zone of interests" test is usually easy when the plaintiff is able to establish third party standing: "if the litigant asserts only the rights of third parties, then he may satisfy the zone of interests requirement by reference to the third parties' interest if the court determines both that the litigant has third party standing and that the third parties' interests fall within the relevant zone of interests." *Haitian Refugee Ctr. v. Gracey*, 809 F.2d 794, 811–12 (D.C.Cir.1987) (citing *FAIC Secs., Inc. v. United States*, 768 F.2d 352, 358 (D.C.Cir.1985)).

■ The government's brief contained nothing on third-party standing. Government counsel said at oral argument that there was no intention to waive an objection on this ground. Normally the proper method of preserving an argument on appeal is to make it. But in this circuit we treat prudential standing as akin to jurisdiction, an issue we may raise on our own,

---

8. Because the district court dismissed for lack of standing, there has been no ruling on the merits of the *AILA/LUPD* challenges to the provisions of IIRIRA dealing with aliens seeking asylum. With respect to *Wood*, there remains a due process challenge on behalf of non-asylum seekers having allegedly sufficient contacts with the United States (for example, returning legal permanent residents).

in part because the doctrine serves the "institutional obligations of the federal courts." *Animal Legal Defense Fund v. Espy,* 23 F.3d 496, 499 (D.C.Cir.1994); *see also Steffan v. Perry,* 41 F.3d 677, 697 & n. 20 (D.C.Cir.1994) (en banc); *cf. United States v. Pryce,* 938 F.2d 1343, 1351 (D.C.Cir.1991) (Randolph, J., concurring).

 Since we will consider third party standing *sua sponte,* a preliminary question needs to be addressed. "Congress may grant an express right of action to persons who would otherwise be barred by prudential standing rules." *Warth v. Seldin,* 422 U.S. 490, 501, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975); *see also Havens Realty Corp. v. Coleman,* 455 U.S. 363, 372, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982); *Fair Employment Council of Greater Washington, Inc. v. BMC Mktg. Corp.,* 28 F.3d 1268, 1278 (D.C.Cir.1994). Has it done so here? We think not. Nothing in IIRIRA supports the idea that Congress intended to allow litigants to assert the rights of others, and there are indications that Congress meant to preclude such suits.

The statute permits judicial review of the "implementation" of 8 U.S.C. § 1225(b), the provision spelling out the procedures for inspecting applicants for admission to the United States. 8 U.S.C. § 1252(e)(3)(A). The judicial review section states that such lawsuits may be brought only in the United States District Court for the District of Columbia; that the lawsuits are limited to determining whether the statute or regulations are constitutional, and whether the regulations or other guidelines are consistent with the statute or other law; and that the lawsuits must be brought within the sixty-day period we have described earlier. 8 U.S.C. §§ 1252(e)(3)(A) & 1252(g). We cannot see anything in these provisions allowing litigants—whether individuals or organizations—to raise claims on behalf of those not party to the lawsuit.

The district court, in ruling that Congress had relaxed the zone of interest test, stressed the sixty-day time limit on judicial review: "such an action would probably not be brought in time if Congress intended that only aliens subject to summary removal orders be allowed to bring such an action." 18 F.Supp.2d at 49. This is a large stretch, especially in light of the fact that some aliens did bring suit within the period. A sixty-day limit is commonplace for judicial review of agency action. The Hobbs Act, 28 U.S.C. § 2344, is a well-known example. No one has ever thought that this time limit, in itself, amounted to a legislative repudiation of prudential standing. *See, e.g., Reytblatt v. NRC,* 105 F.3d 715, 720 (D.C.Cir.1997); *Water Transport Ass'n v. ICC,* 819 F.2d 1189, 1193 & n. 33 (D.C.Cir.1987); *National Treasury Employees Union v. Merit Sys. Protection Bd.,* 743 F.2d 895, 910 (D.C.Cir.1984); *United States v. FMC,* 655 F.2d 247, 251 (D.C.Cir.1980). In each of the cases just cited the sixty-day period for judicial review under the Hobbs Act applied and yet we still required the petitioners to satisfy prudential standing requirements.

We have also considered another argument, although it was not mentioned in the district court's opinion. Washington, D.C., one might suppose, is hardly a convenient forum for an alien removed from, say, a port of entry in Hawaii or California or Florida. Yet—to continue the argument—Congress restricted judicial review to actions brought in the federal court in the District of Columbia, *see* 8 U.S.C. § 1252(e)(3)(A), thereby signifying that organizations, rather than (or perhaps in addition to) individual aliens, may bring suit. The argument is not very telling. For one thing, plaintiffs themselves alleged that Washington is one of the "major locations for summary removal cases." *LUPD/ AILA* Amended Complaint ¶ 85. For another, aliens who have been summarily removed might be from anywhere in the world, regardless of where they attempt to enter the country. When they have been returned to their native country, Washington, D.C. is not necessarily less convenient than any other forum. And once again, it

has been common for Congress to designate the District of Columbia as the exclusive venue for judicial review of agency action. *See, e.g.,* 12 U.S.C. § 2278a–3b (Farm Credit System Assistance Board); 30 U.S.C. § 1276(a)(1) (Surface Mining Act nationwide rules); 42 U.S.C. § 7607(b)(1) (Clean Air Act regulations); 47 U.S.C. § 402(b) (FCC licensing decisions). The purpose is obvious and has nothing to do with prudential standing. By confining judicial review to one venue, Congress avoids conflicting decisions about the validity of particular regulations or statutes.

When we examine other subsections of 8 U.S.C. § 1252(e) dealing with judicial review, we find signs that Congress meant to allow actions only by aliens who have been subjected to the summary procedures contained in § 1225(b) and its implementing regulations. Section 1252(e)(1)(B) provides: "Without regard to the nature of the action or claim and without regard to the identity of the party or parties bringing the action, no court may ... certify a class under Rule 23 of the Federal Rules of Civil Procedure in any action for which judicial review is authorized under a subsequent paragraph of this section." Contrast this prohibition on class actions with the allegations of the organizational plaintiffs. The *LUPD/AILA* amended complaint (¶¶ 96, 99, 103) raises claims on behalf of all "bona fide refugees" and "all aliens who may be eligible" for asylum interviews. The *Wood* amended complaint (¶¶ 1, 6, 79, 80, 85) raises claims on behalf of the alien "clients" of the organizational plaintiffs and "those persons similarly situated who have been and will be harmed by the new expedited removal proceedings created by INA § 235 and governed by the Interim Rules and Defendants' other implementing policies and procedures," a group that includes "United States citizens, lawful permanent residents ('LPRs'), and those other persons eligible for admission to the United States, including nonimmigrant visa holders with facially valid visas, parolees, unaccompanied minors, refugees, asylees, those persons for whom

documents are not required for admission, and those potentially eligible for admission through waivers, adjustment of status or other benefits under the INA."

Such unbounded allegations sweep in nearly all aliens anywhere in the world who have tried or will try to enter the United States. The situation of any particular alien is of no moment, and imposes no confining influence on the scope of the lawsuit. What portions of the statute and regulations will be challenged, and on what grounds, are totally in the control of the organizations and their lawyers. Should we suppose that Congress, having barred class actions, intended to permit actions on behalf of a still wider group of aliens, actions in which no class representative appears as a party and the plaintiffs are unconstrained by the requirements of Federal Rule of Civil Procedure 23? From all we can gather, Congress must have contemplated that lawsuits challenging its enactment would be brought, if at all, by individual aliens who—during the sixty-day period—were aggrieved by the statute's implementation. We come to this conclusion not only in light of the statute's ban on class actions, but also because Congress restricted injunctive relief in the following terms: "no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of [the expedited secondary inspection provisions] other than with respect to the application of such provisions to an individual alien against whom the proceedings under such chapter have been initiated." 8 U.S.C. § 1252(f)(1). The jurisdictional provision provides still further proof: "Except as provided in this section and notwithstanding any other provision of law, no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under this Act." 8 U.S.C. § 1252(g). One cannot come away from reading this section without

having the distinct impression that Congress meant to allow litigation challenging the new system by, and only by, aliens against whom the new procedures had been applied.

■ What we have just written about congressional intent influences our analysis of the judicially-created third party standing doctrine as it applies to the cases before us. We will get to this in a moment, but first we need to look at developments in this circuit and in the Supreme Court. The place to begin is Judge Bork's opinion in *Haitian Refugee Center v. Gracey*, 809 F.2d 794 (D.C.Cir.1987), which describes a lawsuit quite similar to the cases before us. There, organizations challenged a presidential proclamation ordering interdiction of boats carrying undocumented aliens attempting to enter the United States. The organizations complained that the interdiction program violated the rights of the aliens under the Refugee Act of 1980, the due process clause of the Fifth Amendment, and various treaties. *See* 809 F.2d at 797–98. Because the litigants asserted the rights of third party aliens, Judge Bork conducted a thorough examination of cases in which the Supreme Court made exceptions to the traditional prohibition against third party standing. *See id.* at 807–11. The analysis led to the following conclusion: "If the government has directly interfered with the litigant's ability to engage in conduct together with the third party, for example, by putting the litigant under a legal disability with criminal penalties, and if a statute or the Constitution grants the third party a right to engage in that conduct with the litigant, the litigant has standing to challenge the government's interference by invoking the third party's rights." *Id.* at 808. Most of the cases allowing third party standing involved laws that imposed legal sanctions on the litigant.[9] Third party standing was allowed because "enforcement of the challenged restriction against the litigant" resulted "in the violation of the third parties' rights." *Id.* (quoting *Warth*, 422 U.S. at 510, 95 S.Ct. 2197)). This circumstance eliminates one of the concerns animating the third party prohibition: courts should not decide disputes if third parties will be able to exercise their rights regardless of the litigant's success. *See Singleton v. Wulff*, 428 U.S. 106, 114, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976) (citing *Ashwander v. TVA*, 297 U.S. 288, 345–48, 56 S.Ct. 466, 80 L.Ed. 688 (1936) (Brandeis, J., concurring)). The direct impact of the law on the litigant also mitigates the concern that third parties would be better proponents of their own rights. *See id.* (citing *Holden v. Hardy*, 169 U.S. 366, 397, 18 S.Ct. 383, 42 L.Ed. 780 (1898)).

The Supreme Court has also recognized third party standing when a law, though not punishing the litigant, directly interferes with a protected relationship between the litigant and third party. *Singleton v. Wulff*, in which doctors challenged a law that prohibited Medicaid payments for abortions that were not "medically indicated," is such a case. *See* 428 U.S. at 106, 96 S.Ct. 2868. In a plurality opinion,[10] Jus-

---

9. As examples, see *Secretary of State of Maryland v. J.H. Munson Co.*, 467 U.S. 947, 955–59, 104 S.Ct. 2839, 81 L.Ed.2d 786 (1984), in which a fundraiser had standing to raise the First Amendment rights of donors because the statute penalized fundraisers for receiving commissions; *Craig v. Boren*, 429 U.S. 190, 194–97, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976), in which the Court recognized standing for a beer vendor to assert the equal protection claims of males who were not allowed to purchase beer until they turned 21, although women could purchase beer upon turning 18; *Doe v. Bolton*, 410 U.S. 179, 188–89, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973), in which doctors were allowed to assert the privacy interests of patients because the statute imposed criminal penalties on doctors performing abortions; and *Eisenstadt v. Baird*, 405 U.S. 438, 443–46, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972), in which vendors of contraceptives had standing to assert purchasers' privacy interests because the statute criminalized selling contraceptives.

10. Justice Stevens, the fifth vote for standing, wrote separately on the grounds that the doctors were asserting their own rights.

tice Blackmun found that the law was "specifically intended to burden the third party's relationship with their physicians." *Haitian Refugee Ctr.,* 809 F.2d at 810 (citing *Singleton,* 428 U.S. at 106, 96 S.Ct. 2868). Because the right being asserted— the third party patient's *Roe v. Wade* right—was a right protecting the patient's access to physicians, the Court recognized third party standing.

In contrast, the interdiction law at issue in *Haitian Refugee* did not directly interfere with the relationship between Haitians and the litigants who were trying to help them. *See id.* Impeding contact between the two groups was only an indirect effect of the interdiction program's aim of preventing the entry of Haitians. *See id.* at 809–10. Yet "allowing standing for unintended side effects of programs would involve the court in the continual supervision of more governmental activities than separation of powers concerns should permit." *Id.* Moreover, the constitutional rights asserted—the Haitians' due process rights—did not protect a relationship between the litigants and the aliens. *See id.* at 809. The same is true in our case. The organizations faced no legal sanction from the statute or the regulations. The claimed violation of aliens' rights—impeded access to attorneys—is but a side effect of the expedited removal system.

In addition to the factual congruity between *Haitian Refugee* and this case, the rule of decision Judge Bork announced for the court[11] would foreclose the organizational plaintiffs from litigating the due process rights of unnamed aliens. *Haitian Refugee* held: "A litigant therefore could never have standing to challenge a statute

solely on the ground that it failed to provide due process to third parties not before the court." *Id.*[12]

Nonetheless, plaintiffs argue that one of our recent decisions is squarely at odds with the rule of *Haitian Refugee* just quoted. They have a point. A few months ago, this court—without mentioning *Haitian Refugee*—allowed a litigant to assert the due process rights of third parties. *See Lepelletier v. FDIC,* 164 F.3d 37 (D.C.Cir.1999). The plaintiff in *Lepelletier* was a "money finder," a person who receives income by locating the owners of unclaimed deposits at failed banks. Lepelletier filed suit against the FDIC, the receiver of three failed banks, after the agency denied his Freedom of Information Act requests for the names of the owners of the unclaimed deposits. *See id.* at 40–41. The complaint alleged that "under the due process clause of the Fifth Amendment, the FDIC was required to publish the names of all parties with unclaimed deposits before forfeiting the funds...." *Id.* at 41. Because the unidentified depositors' property interest gave rise to the due process claim, Lepelletier had to overcome third party standing doctrine. *See id.* at 42.

The *Lepelletier* court invoked, without discussion, the three-part test for third party standing the Supreme Court announced in *Powers v. Ohio,* 499 U.S. 400, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991). *See* 164 F.3d at 43. *Powers* allowed a criminal defendant to assert a claim of racial discrimination in jury selection because: 1) the defendant suffered an injury in fact;[13] 2) he had a close relationship to

---

**11.** Judge Buckley joined this portion of Judge Bork's opinion, *see* 809 F.2d at 796 n. 1, and it therefore represented the law of the circuit.

**12.** At oral argument, plaintiffs cited *National Cottonseed Products Ass'n v. Brock,* 825 F.2d 482 (D.C.Cir.1987), the one opinion of this circuit to question *Haitian Refugee.* But the doubt expressed there has no bearing on this case. It dealt with the portion of Judge Bork's *Haitian Refugee* opinion dealing with

whether third party standing automatically attached to a vendor-vendee relationship.

**13.** We cannot see what this factor adds. Prudential standing aside, if the litigant has not suffered injury there is no constitutional standing. *See Valley Forge Christian College v. Americans United For Separation of Church & State, Inc.,* 454 U.S. 464, 472, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982).

the excluded jurors; and 3) there was some hindrance to the excluded jurors asserting their own rights. 499 U.S. at 411, 111 S.Ct. 1364; *see also Campbell v. Louisiana*, 523 U.S. 392, 118 S.Ct. 1419, 140 L.Ed.2d 551 (1998) (applying *Powers* in the grand jury context).

Did *Powers* supersede the *Haitian Refugee* rule? The defendant in *Powers* certainly faced a legal penalty (imprisonment), but it is not clear that a juror's equal protection rights "protect that party's relationship with the litigant." *Haitian Refugee*, 809 F.2d at 809. The *Powers* Court referred to "the relation between petitioner and excluded jurors," *Powers*, 499 U.S. at 413, 111 S.Ct. 1364, but the jurors' equal protection rights were treated principally as a protection of the integrity of the judicial system, *see id.* at 412, 414, 111 S.Ct. 1364. It could be that *Haitian Refugee* and *Powers* now coexist and a party can establish third party standing by meeting either standard. A post-*Powers* decision of this court appears to take this approach. *Fair Employment Council* continued to apply the *Haitian Refugee* "relationship" standard, *see Fair Employment Council*, 28 F.3d at 1280 (quoting *Haitian Refugee*, 809 F.2d at 809), but applied that standard only after deciding that plaintiffs could not meet the *Powers* "obstacle" test, *see id.*

The effect of subsequent case law on the *Haitian Refugee* rule is not entirely clear. Nor is the general state of third party standing law. *See Miller v. Albright*, 523 U.S. 420, 454 n. 1, 118 S.Ct. 1428, 140 L.Ed.2d 575 (1998) (Scalia, J., concurring) ("Our law on [third-party standing] is in need of what may charitably be called clarification.").[14] Although we are unsure how to reconcile *Haitian Refugee* with *Powers* and *Lepelletier*, we can decide this appeal without making the attempt. Even under the *Powers* formulation, the organizational plaintiffs cannot prevail. To establish third party standing "there must exist some hindrance to the third party's ability to protect his or her own interests."[15] *Powers*, 499 U.S. at 411, 111 S.Ct. 1364. *Singleton v. Wulff*, 428 U.S. at 116, 96 S.Ct. 2868, sounded a similar note: "If there is some genuine obstacle ... the third party's absence from court loses its tendency to suggest that his right is not truly at stake, or truly important to him, and the party who is in court becomes by default the right's best available proponent." We do not believe excluded aliens suffered from the type of impediment, the "hindrance" or "obstacle," the Court had in mind.

We accept plaintiffs' statement that "aliens removed directly from secondary inspection are detained and prohibited from communicating with anyone throughout their stay in the country." Opening

14. A third party standing decision of the Supreme Court after *Haitian Refugee* allowed an attorney to assert the due process claims of his client. *See United States Dep't of Labor v. Triplett*, 494 U.S. 715, 110 S.Ct. 1428, 108 L.Ed.2d 701 (1990). The law being challenged regulated the fees an attorney could receive in black lung disease cases. *Triplett* thus is another example of the well-established exception that a litigant can assert third party claims when the challenged law imposes a penalty on the litigant.

 *Miller v. Albright*, 523 U.S. 420, 118 S.Ct. 1428, 140 L.Ed.2d 575 (1998), also involved a legal disability imposed on the litigant. The plaintiff had been denied citizenship on the basis of a proof-of-paternity requirement for illegitimate, foreign-born offspring of American fathers. The Court allowed the plaintiff

to raise her father's equal protection claim (a test was not required for the illegitimate, foreign-born offspring of American mothers). *See id.* at 424–27, 118 S.Ct. 1428.

15. This language demonstrates that when the "*Powers* test" is applied, all three requirements must be met. *See also Powers*, 499 U.S. at 411, 111 S.Ct. 1364 ("We have recognized the right of litigants to bring actions on behalf of third parties, provided three important criteria are satisfied...."). *Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 623 n. 3, 109 S.Ct. 2646, 105 L.Ed.2d 528 (1989), which upheld third party standing even though the hindrance requirement "counsel[ed] against review," appears inconsistent with the Court's current approach.

Brief for Plaintiffs–Appellants at 46. But the period of detention typically was quite short; that is the point of summary removal. When an alien returned to his native country, nothing prevented him from bringing suit here. To this the organizational plaintiffs reply that "under the construction of the 60–day limit adopted by the district court, for those aliens arriving after June 1, 1997, there is no possibility of bringing a challenge at all." *Id.* at 47, 96 S.Ct. 2868. True enough. But this is precisely what Congress intended.

None of the Supreme Court's decisions invoking the *Powers* formulation even comes close to suggesting what plaintiffs propose. In *Powers* itself, the third party juror "possess[ed] little incentive" to bring suit because "of the small financial stake involved and the economic burdens of litigation." 499 U.S. at 415, 111 S.Ct. 1364. It also would have been difficult for the excluded juror to recognize, and later prove, that his exclusion was the result of systemic discrimination. *See id.* at 414–15, 111 S.Ct. 1364; *see also Barrows v. Jackson,* 346 U.S. 249, 254, 257, 73 S.Ct. 1031, 97 L.Ed. 1586 (1953) (allowing third party standing to vindicate the rights of "unidentified" victims of racially restrictive covenant). This latter consideration—unawareness of the injury—is the type of obstacle *Lepelletier* thought adequate to meet the *Powers* standard. The third parties in *Lepelletier* were unidentified depositors who did not know they were being deprived of property. Excluded aliens faced no comparable impediment to suit. They were quite aware of their summary removal. And they had a strong incentive to challenge the exclusion procedures in court.

Justice O'Connor, joined by Justice Kennedy, has said that when a "hindrance signals that the rightholder did not simply decline to bring the claim on his own behalf, but could not in fact do so," third party standing may be permitted. *Miller v. Albright,* 523 U.S. at 450, 118 S.Ct. 1428 (O'Connor, J., concurring). *Hodel v. Irving,* 481 U.S. 704, 711–12, 107 S.Ct. 2076, 95 L.Ed.2d 668 (1987), involves the most obvious application of this principle: the rightholders, the litigants' parents, were deceased. Another case, *Singleton,* 428 U.S. at 117, 96 S.Ct. 2868, held that the "imminent mootness" of any woman's claimed right to an abortion posed an obstacle to her assertion of the right. And the Court permitted third party standing when assertion of the right would essentially defeat it. *See NAACP v. Alabama ex rel. Patterson,* 357 U.S. 449, 459, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958) (recognizing that if the organization were required to assert its own privacy interests, the privacy it sought to protect would be undermined).

We do not believe aliens excluded in the Spring of 1997, when the statute was first implemented, were in a position comparable to the missing individuals in the cases we have just summarized. Congress passed IIRIRA in September 1996. The organizations appearing before us, whose purpose it is to assist aliens arriving on our shores, thus knew well ahead of time what was coming. On March 27, 1997, five days before the implementing regulations went into effect, the American Immigration Lawyers Association and three other organizations filed suit. They eventually added, within 60 days of April 1, the two excluded aliens whose claims the district court adjudicated on the merits. The organizations do not allege that, despite their best efforts, they were unable to identify and provide legal assistance to any other potential plaintiffs—that is, aliens facing removal during the relevant time frame. How large was the pool? The government informed us after argument that in the 60 days beginning April 1, 1997, immigration officials processed approximately 10,200 expedited removal cases at the country's 25 largest ports of entry—or 1200 per week.

To the extent there were obstacles or hindrances to any of these individuals joining in the cases, they are either

imposed by Congress or result from the normal burdens of litigation. Those who are not financially well off face obvious obstacles when they seek to bring a lawsuit. Some excluded aliens, but hardly all,[16] doubtless fell into that category. Those who are uninformed about the workings of the courts, or of their legal rights, or of the availability of counsel, also face obstacles. Individuals who do not speak English or who reside far from the courthouse are hindered when it comes to taking legal action. Congress knew all this as well as we do, and as well as the organizational plaintiffs do. Yet rather than alleviating these burdens Congress placed strict limits on the time for filing challenges to the summary removal system, and it barred class actions. To allow third party standing in the face of those provisions (which are not challenged) and the jurisdictional provision mentioned earlier (p. 1359–60, *supra*) would be to contradict the principles on which the standing doctrine rests—namely, "the proper—and properly limited—role of the courts in a democratic society." *Warth v. Seldin,* 422 U.S. at 498, 95 S.Ct. 2197; *Allen v. Wright,* 468 U.S. at 750–52, 104 S.Ct. 3315. Congress imposed the 60–day limit on actions in order to cabin judicial review and to have the validity of the new law decided promptly. It would be inconsistent with the "properly limited role of the courts" for us to use this provision as the basis for expanding jurisdiction through the back door of third party standing. And in the face of a statute barring even class actions that comply with the rules of procedure, it would be inconsistent, indeed almost contradictory, if the device of third party representation could be used to prosecute what are essentially unbounded class lawsuits.

 We mentioned earlier that Congress may relax the prudential stand-

ing rules the judiciary has created. *See Warth v. Seldin,* 422 U.S. at 501, 95 S.Ct. 2197; *Havens Realty Corp. v. Coleman,* 455 U.S. at 372, 102 S.Ct. 1114; *Fair Employment Council,* 28 F.3d at 1278. Congress may do so—and has sometimes done so—in the exercise of its Article I power, so long as it keeps within the limits of Article III of the Constitution. *See* Henry P. Monaghan, *Third Party Standing,* 84 COLUM. L.REV. 277, 313 & n.195 (1984). If Congress can thus expand federal jurisdiction, Congress also has the power to contract federal jurisdiction. There is no reason why, for instance, a statute could not expressly state that, without exception, each party to a lawsuit must raise only their rights and not the rights of others. That would constitute a legislative direction to the courts that the third party standing doctrine, in its strictest form, must be applied. Congress may not have gone so far in IIRIRA. But our analysis of the statute, and particularly the bar on class actions, strengthens the judicial presumption against suits seeking relief for a large and diffuse group of individuals, none of whom are parties to the lawsuit—suits, that is, such as the ones before us. For all of these reasons, we hold that the plaintiff organizations do not have standing to raise claims, whether statutory or constitutional, on behalf of aliens subjected to IIRIRA's expedited removal system.

*Affirmed.*

---

**16.** For instance, the excluded aliens added in the amended *Wood* complaint included two British citizens who supplied items to U.S. Air Force squadrons in England; a citizen of the Peoples Republic of China who is the president of a real estate development company; a businesswoman from Canada; and another Canadian citizen who held a degree in hotel/restaurant management from an American university.