# In the

# United States Court of Appeals

## For the Seventh Circuit

No. 09-3825

FAISAL KHAN,

*Petitioner*,

*v.*

ERIC H. HOLDER, JR., Attorney General
of the United States,

*Respondent.*

Petition To Review an Order of the
Department of Homeland Security.
No. A089 280 927

No. 09-3882

MONA KHAN,

*Petitioner*,

*v.*

ERIC H. HOLDER, JR., Attorney General
of the United States,

*Respondent.*

Petition To Review an Order of the
Department of Homeland Security.
No. A089 280 928

SUBMITTED JANUARY 6, 2010—DECIDED JUNE 11, 2010

Before EASTERBROOK, *Chief Judge,* and WOOD and EVANS, *Circuit Judges.*

WOOD, *Circuit Judge.*   Petitioner Faisal Khan and his sister Mona Khan, citizens of Pakistan, obtained B1/B2 non-immigrant visitor's visas to travel to the United States, purportedly for a two-month visit with their brother and his wife, whom they had not yet met. Immediately upon the arrival of the Khans and their parents at Chicago's O'Hare Airport, Faisal and Mona were detained by the Department of Homeland Security. (The status of the parents is not before us.) Faisal and Mona were placed in expedited removal proceedings and ordered to return immediately to Pakistan. Each filed a petition for review from the removal order and a motion to stay removal pending resolution of the petition. We conclude that the government's motions to dismiss the petitions for review for lack of jurisdiction must be granted.

At the time counsel for the petitioners filed the petition for review from Faisal's removal order and the motion to stay his removal, counsel had almost no information regarding the removal proceedings, because neither counsel nor Faisal's family members had been permitted to speak to him. Counsel had been unable to obtain even a copy of the removal order. According to the information counsel had received, Faisal was scheduled to be removed on a flight that evening. With little information about why Faisal, who had a valid passport and a valid visitor's visa, was being removed, we ordered a temporary stay of his removal and ordered the govern-

ment to respond. One week later, Mona, who had been paroled into the United States for a total of seven days to obtain medical care, was ordered removed, and she filed a petition for review and motion to stay her imminent removal. We again temporarily stayed her removal in order to obtain a response and additional information.

The government has responded to the motions to stay removal and has furnished the expedited removal orders and related documents. These materials explain why the Khans were not admitted at O'Hare, even though the government concedes that they had valid, unexpired passports and valid, unexpired B1/B2 non-immigrant visitor's visas. At O'Hare, a United States Customs and Border Protection ("CBP") investigating officer determined that the Khans actually intended to immigrate to the United States from Pakistan rather than temporarily visit, and they lacked the necessary documentation to immigrate. A different visa is needed for an alien who intends to immigrate than for an alien who has a residence in a foreign country that he has no intention of abandoning and who is visiting the United States temporarily for business or pleasure. 8 U.S.C. § 1101(a)(15)(B). Based on the examination at the border, CBP charged the Khans as inadmissible because they were attempting to immigrate without immigrant visas, in violation of 8 U.S.C. § 1182(a)(7)(A)(i)(I), and it processed them for expedited removal under 8 U.S.C. § 1225(b)(1)(A)(i). In short order, they were served with a Notice and Order of Expedited Removal and found removable as charged; the order was then approved by a CBP Chief. See 8 C.F.R. § 1235.3(b)(2), (7).

The government has called our attention to a number of factors that support its determination that Faisal intended to immigrate. Although we lack jurisdiction to review the merits of the question whether the CBP officer correctly initiated expedited removal proceedings, we note some of the contested factors only to highlight a few of the concerns with the expedited removal procedure that the petitioners are attempting to raise. Perhaps what initially aroused the CBP officer's suspicions was Faisal's return airline ticket for August 2010, seven months later than it should have been under his stated travel plans for a two-month visit. Faisal also had $7,800 in cash, his resume translated into English, and blank letterhead from his current employer in Pakistan. The government has also given us a 5-page transcript from Faisal's interview with the CBP officer. It believes that the transcript supports the conclusion that Faisal intended to immigrate to the United States.

We are not so sure. Some of the answers are inconsistent and could support Faisal's argument that he was confused and needed a translator. Faisal also protests that the interview lasted for hours and the 5-page document could not possibly be a full transcript. He maintains that the questions and answers the government has selected were taken out of context. He answered "yes" to the question whether he "planned on seeking employment during this entry" but only one page earlier he explained that he brought his documents because "I thought that it would prove I am going back to my job in Pakistan." Faisal also said, "We are coming just to visit, but if the opportunity came for me to get a job then we would stay."

Toward the end of the questioning, Faisal answered "yes" to the question whether he had been untruthful, and when asked why he had been untruthful, Faisal responded "I did a big stupid thing." The officer then asked three separate questions whether he, his parents, and his sister were "immigrating to the United States on their B1/B2 visas, and he said "yes" to each. But when the officer repeated, "You, your sister and parents were attempting to immigrate to the United States today, is that correct?," Faisal responded, "What does that mean?" Faisal refused to sign the record of his statement or any other documents because he did not believe they were correct. In his petition before this court, he has tendered an affidavit that he says he would offer if the case were remanded for further proceedings and he could submit his own evidence. He says that he repeatedly told the officer that he was employed in Pakistan, that he was not lying, and that he had come to visit his brother and vacation with his family. Faisal asserts that the officer said that Pakistanis and Muslims "always come to the United States to marry or to get a job. She also said that we always lie and that this is what I was doing."

Mona's removal proceedings were conducted through an interpreter, but she was not provided an interpreter during her initial questioning the prior week. Although the statute does not require it, regulations issued by the Department of Homeland Security provide that during the interview process, "[i]nterpretive assistance shall be used if necessary to communicate with the alien." 8 C.F.R. § 235.3(b)(2)(i). The officer in the removal proceedings

referred back to Mona's answers during the earlier questioning and refused to re-interview her on matters related to the initial interview. When asked what the purpose of her visit was, she responded, "I am here to visit my brother and my new sister-in-law and vacation." She agreed that she had told an officer during the initial interview that she would attend school or marry someone in the United States if that is what her family told her to do because she willingly allows her family to make her life decisions. Mona admitted that she brought her school transcripts and diplomas with her.

The government moves to dismiss the petitions under 8 U.S.C. § 1252(a)(2)(A), which provides that "no court shall have jurisdiction to review" an order of expedited removal under § 1225(b)(1). Although § 1252(e)(2) contains a limited exception permitting review of specific determinations by habeas corpus petitions, the Khans do not argue that subsection (e) applies here. Instead, they assert only that this court may have jurisdiction under a "safety valve" established for substantial constitutional questions, when review would otherwise be barred by § 1252, "to enable judicial correction of bizarre miscarriages of justice." *LaGuerre v. Reno*, 164 F.3d 1035, 1040 (7th Cir. 1998). See also *Singh v. Reno*, 182 F.3d 504, 510 (7th Cir. 1999). This is such a case, they say, in light of the government's position, which Faisal characterizes as: "even if no power has been conveyed by the legislative to the executive branch to enter the removal order at issue herein, even if the order is legally flawed, notwithstanding that the Petitioner was questioned for seven hours in the dead of night without any interpreter

despite the agency's own regulations calling for one, no court has the power to consider the legality of the agency's actions." They opine that this is a proposition of frightening breadth.

The government responds that this court's cases establishing a safety valve are distinguishable because they did not involve the same jurisdictional bar that governs this case. The review-limiting provisions in those cases, which involved § 1252(a)(2)(C) and § 1252(g), left open the opportunity for aliens (who could have filed habeas corpus petitions in the district courts prior to the 1996 Amendments to the Immigration and Naturalization Act) to bring constitutional issues directly before the courts of appeals. See *Morales-Ramirez v. Reno*, 209 F.3d 977 (7th Cir. 2000); *Singh*, 182 F.3d 504; *LaGuerre*, 164 F.3d 1035. Moreover, section 1252(a)(2)(D) specifically provides that "Nothing in subparagraph (B) or (C), or in any other provision of this chapter (other than this section) which limits or eliminates judicial review, shall be construed as precluding review of constitutional claims or questions of law." Section 1252(a)(2)(A), however, is not mentioned in § 1252(a)(2)(D) as leaving open such an opportunity; to the contrary, it expressly prohibits aliens from raising such claims before the court of appeals. See *Hussain v. Keisler*, 505 F.3d 779, 784 (7th Cir. 2007) ("Section 1252(a)(2)(D) plainly states that other limitations on judicial review in 'this section'— that is, section 1252—still apply."). Other circuits have held that constitutional and statutory claims arising in expedited removal proceedings are not reviewable. *Garcia de Rincon v. DHS*, 539 F.3d 1133, 1138-39 (9th Cir. 2008)

(Section 1252(a)(2)(D) does not apply to the jurisdictional limitations in § 1252(a)(2)(A)); *Turgerael v. Mukasey*, 513 F.3d 1202, 1205-06 (10th Cir. 2008) (Section 1252(a)(2)(D) preserves the jurisdictional bar of § 1252(a)(2)(A)). While the Khans attempt to distinguish these cases because they involved collateral attacks to expedited removal in the context of reinstatement of removal, the language of the cases is not so limited, and nearly all of the cases addressing the expedited removal statute arise in the reinstatement context.

The Khans acknowledge that this court's cases recognizing a safety valve involved § 1252(a)(2)(C), whereas they were at the point of initial entry where their constitutional rights were at their lowest ebb. They protest, nevertheless, that the purpose of the "safety valve" theory is that some limited jurisdictional review must be available despite congressional attempts to bar review. *Cf. INS v. St. Cyr*, 533 U.S. 289, 304-05 (2001) (determining that some jurisdiction must continue to exist over pure questions of law and constitutional questions but noting the absence of any express repeal of § 2241 habeas corpus jurisdiction). Here, the Khans acknowledge that there has been an express repeal of jurisdiction. They nonetheless assume that the court may somehow disregard the jurisdiction-stripping statute and reach their constitutional issues under the safety valve. Indeed, they go on to suggest that it would be anomalous for the court to refuse to consider statutory arguments since courts prefer to decide a case on legal grounds rather than constitutional grounds. They make the specific argument that the applicable regulation, 8 C.F.R.

§ 235.3, is invalid because it grants the government agents the power to order removal without basing any factual findings on clear, convincing, and unequivocal evidence. They argue that there is nothing in § 1225(b)(1) to indicate that Congress intended to modify the rule from *Woodby v. INS*, 385 U.S. 276, 286 (1966), that no deportation order may be entered unless it is found by clear, unequivocal, and convincing evidence that the facts alleged as grounds for deportation are true. They believe that doubtful cases should be referred to an immigration judge, giving effect to the statutory provisions whereby applicants for admission who are not "clearly and beyond a doubt entitled to be admitted" be referred to an immigration judge for a hearing. 8 U.S.C. § 1225(b)(2)(A). Finally, they point out that the removal orders do not charge that they engaged in fraud in violation of 8 U.S.C. § 1182(a)(6)(C), and without fraud, there is no support that they lacked valid visas.

The troubling reality of the expedited removal procedure is that a CBP officer can create the § 1182(a)(7) charge by deciding to convert the person's status from a non-immigrant with valid papers to an intending immigrant without the proper papers, and then that same officer, free from the risk of judicial oversight, can confirm his or her suspicions of the person's intentions and find the person guilty of that charge. The entire process—from the initial decision to convert the person's status to removal—can happen without any check on whether the person understood the proceedings, had an interpreter, or enjoyed any other safeguards. To say that this procedure is fraught with risk of arbitrary, mistaken,

or discriminatory behavior (suppose a particular CBP officer decides that enough visitors from Africa have already entered the United States) is not, however, to say that courts are free to disregard jurisdictional limitations. They are not, and we thus must align ourselves with the courts that have considered the issue and hold that we lack jurisdiction to inquire whether the expedited removal procedure to which the Khans were subjected was properly invoked. *Brumme v. INS*, 275 F.3d 443 (5th Cir. 2001); *Li v. Eddy*, 259 F.3d 1132, 1134 (9th Cir. 2001), *opinion vacated as moot*, 324 F.3d 1109 (9th Cir. 2003) ("On its face, subsection (e)(2) does not appear to permit the court to inquire into whether section 1225(b)(1) was properly invoked, but only whether it was invoked at all."). Under § 1252(e), which sets forth the limited exceptions to the jurisdictional bar, a court has jurisdiction to inquire only "whether such an order in fact was issued and whether it relates to the petitioner. There shall be no review of whether the alien is actually inadmissible or entitled to any relief from removal." 8 U.S.C. § 1252(e)(5).

In a similar situation, the Fifth Circuit affirmed a district court's dismissal for lack of jurisdiction of a habeas corpus petition challenging an expedited removal order. *Brumme v. INS*, 275 F.3d 443 (5th Cir. 2001). The petitioner was a native and citizen of Germany, but she made frequent trips to the United States, owned a home in Tucson, and had a visitor's visa valid through 2005. In March 2000, she and her husband returned to the United States and received entry permits valid through August 2000. In July 2000, the petitioner

went to Germany for 10 days to visit her mother and attempted to re-enter the United States to return to her husband, who was being treated here for cancer. The INS inspector determined that she intended to become an immigrant and did not possess a valid immigrant visa, and she was ordered removed under § 1182(a)(7). The district court concluded that it lacked jurisdiction under § 1252(e)(5) to decide the real issues the petitioner was trying to raise—whether she was admissible or entitled to relief from removal—and the Fifth Circuit affirmed the dismissal. *Id.* at 446.

Finally, the Khans have attempted to challenge the regulations under which their case has been processed. But that is nothing but a thinly disguised challenge to the validity of the expedited removal system and is untimely under § 1252(e)(3), which permitted a judicial review in an action instituted in the United States District Court for the District of Columbia no later than 60 days after it was first implemented. In fact, such a challenge was brought, and the District Court for the District of Columbia upheld the regulations as written against challenges to: (1) the ban on aliens' communicating with family, friends and counsel during secondary inspection; (2) the failure to provide adequate language interpretation at secondary inspection; (3) the failure to provide adequate access to and participation of counsel prior to and during the secondary inspection; (4) the failure to provide adequate information on charges and procedures, the opportunity to contest those charges, and the failure to provide for review of removal orders; and (5) the application of these procedures to individuals with

facially valid documents. *American Immigration Lawyers Ass'n v. Reno*, 18 F. Supp. 2d 38, 53-57 (D.D.C. 1998), *aff'd*, 199 F.3d 1352 (D.C. Cir. 2000).

As relevant here, the district court rejected the plaintiffs' argument that expedited removal procedures should apply only to aliens whose travel documents are facially invalid and that aliens found inadmissible under § 1182(a)(6)(C) or (a)(7) based on other factors should be referred to an immigration judge. 18 F. Supp. 2d at 56. The court held that the plain language of the statute provides that inadmissibility under these provisions can arise for reasons other than facially invalid or absent papers. *Id*. "Thus, an inspecting officer can and must refuse admission if a visa holder fails to establish to the inspector's own satisfaction that the visa holder fulfills the requirements for the classification which his visa bears. Contrary to plaintiffs' apparent belief, the inspector is not statutorily limited to ascertaining that the 'face' of the visa indicates that a consular officer has found the alien admissible; rather, the inspector undertakes an independent admissibility determination himself." *Id*. at 57. Finally, the district court ruled that § 1252(e)(3)(A)(ii) permitted it to review only the regulations as written, not as applied and not for the agency's alleged failure to follow its own regulations. *Id*. at 58. The court acknowledged concern, as we do, with the effects of Congress's decision to bar the unwritten actions of the agency from judicial review, particularly where individual CBP agents are given so much discretion and are subjected only to a supervisor's review of their decisions. *Id*.

We nonetheless conclude that we are required by law to GRANT the government's motions to dismiss and DISMISS the petitions for review for lack of jurisdiction. The motions to stay removal pending resolution of the petitions for review are DENIED.