**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

VIJAYAKUMAR THURAISSIGIAM,
*Petitioner-Appellant*,

v.

U.S. DEPARTMENT OF HOMELAND
SECURITY; U.S. CUSTOMS AND
BORDER PROTECTION; U.S.
CITIZENSHIP AND IMMIGRATION
SERVICES; U.S. IMMIGRATION AND
CUSTOMS ENFORCEMENT; KIRSTJEN
NIELSEN, Secretary of DHS;
WILLIAM P. BARR, Attorney
General; KEVIN K. MCALEENAN,
Acting Commissioner of CBP;
THOMAS HOMAN; L. FRANCIS
CISSNA, Director of USCIS; PETE
FLORES, San Diego Field Director,
CBP; GREGORY ARCHAMBEAULT,
San Diego Field Office Director,
ICE; FRED FIGUEROA, Warden, Otay
Mesa Detention Center,
*Respondents-Appellees*.

No. 18-55313

D.C. No.
CV 18-135 AJB

OPINION

Appeal from the United States District Court
for the Southern District of California
Anthony J. Battaglia, District Judge, Presiding

Argued and Submitted May 17, 2018
Portland, Oregon

Filed March 7, 2019

Before: A. Wallace Tashima, M. Margaret McKeown,
and Richard A. Paez, Circuit Judges.

Opinion by Judge Tashima

## SUMMARY[*]

### Immigration

In an action in which Vijayakumar Thuraissigiam filed a habeas petition to challenge procedures leading to his expedited removal order, the panel reversed the district court's dismissal of the petition for lack of subject matter jurisdiction, held that 8 U.S.C. § 1252(e)(2) violates the Suspension Clause as applied to Thuraissigiam, and remanded.

Under 8 U.S.C. § 1225(b)(1)(A)(i), when a U.S. Customs and Border Protection ("CBP") officer determines that a noncitizen arriving at a port of entry is inadmissible for misrepresenting a material fact or lacking necessary documentation, the officer must place the noncitizen in so-called "expedited removal" proceedings. Expedited removal also applies to inadmissible noncitizens arrested within 100

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

miles of the border and unable to prove that they have been in the United States for more than the prior two weeks.

The Department of Homeland Security ("DHS") removes noncitizens eligible for expedited removal without further hearing or review, subject to only one exception: If, in an interview with a CBP officer, the noncitizen indicates an intent to apply for asylum or a fear of persecution, DHS must refer the noncitizen for an interview with an asylum officer. If the asylum officer finds no credible fear of persecution, the noncitizen will be removed. A supervisor reviews the asylum officer's credible fear determination, and the noncitizen may also request de novo review by an immigration judge.

Congress sharply circumscribed judicial review of the expedited removal process such that "no court shall have jurisdiction to review . . . any individual determination [or] . . . the application of [§ 1225(b)(1)] to individual aliens" outside of the review permitted by the habeas review provision, § 1252(e). 8 U.S.C. § 1252(a)(2)(A)(iii). Under § 1252(e)(2), a person in expedited removal proceedings may file a habeas petition in federal district court to contest three DHS determinations: whether the person is a noncitizen, whether he "was ordered removed" via expedited removal, and whether he is a lawful permanent resident or has another status exempting him from expedited removal.

Thuraissigiam is a native and citizen of Sri Lanka and a Tamil, an ethnic minority group in Sri Lanka. After crossing into the United States, he was arrested 25 yards north of the Mexican border, and placed in expedited removal proceedings. He was referred for a credible fear interview after he indicated a fear of persecution in Sri Lanka, but an asylum officer determined that Thuraissigiam had not

established a credible fear of persecution. A supervisor approved the decision, and an immigration judge affirmed the negative credible fear finding in a check-box decision and returned the case to DHS for Thuraissigiam's removal.

Thuraissigiam filed a habeas petition in federal district court, arguing that his expedited removal order violated his statutory, regulatory, and constitutional rights. The district court dismissed the petition for lack of subject matter jurisdiction, concluding that § 1252(e) did not authorize jurisdiction over Thuraissigiam's claims and rejecting his Suspension Clause arguments.

The panel concluded, in line with this court's precedents, that § 1252(e)(2) does not authorize jurisdiction over Thuraissigiam's petition because § 1252(e)(2) limits a district court to reviewing three basic factual determinations related to an expedited removal order, and Thuraissigiam's petition does not challenge any of those determinations.

The panel next considered whether the habeas review available to Thuraissigiam under § 1252(e)(2) satisfied the requirements of the Suspension Clause. In doing so, the panel observed that *Boumediene v. Bush*, 553 U.S. 723 (2008), provides an analytical template for evaluating a Suspension Clause challenge: at step one, the court examines whether the Suspension Clause applies to the petitioner; and, if so, at step two, the court examines whether the substitute procedure provides review that satisfies the Clause.

The panel also observed that *INS v. St. Cyr*, 533 U.S. 289, 302 (2001), illuminates how to approach both *Boumediene* steps. The panel explained that, like *Boumedine*, *St. Cyr* looked to the 1789-era historical application of the writ of

habeas corpus, but that *St. Cyr* also looked to habeas precedents from the co-called "finality era," a period from 1891 to 1952 during which the statutory scheme precluded judicial intervention in immigration enforcement, except as required by the Constitution.

Drawing from *Boumedine* and *St. Cyr*, the panel concluded that it must evaluate Thuraissigiam's Suspension Clause challenge in two steps: First, to determine whether Thuraissigiam may invoke the Suspension Clause, the court examines 1789-era practice, the finality era cases, and other relevant precedents. Second, the court asks whether § 1252(e)(2) provides Thuraissigiam a "meaningful opportunity to demonstrate that he is being held pursuant to 'the erroneous application or interpretation' of relevant law." *Boumediene*, 553 U.S. at 779 (quoting *St. Cyr*, 533 U.S. at 302).

In applying *Boumediene* step one, which concerns the reach of the Suspension Clause, the panel concluded that Thuraissigiam, who was arrested within the United States, may invoke the Suspension Clause. In so concluding, the panel observed that, in the finality era, the Court permitted even arriving noncitizens to invoke habeas review.

The panel considered at *Boumediene* step two whether habeas review under § 1252(e) is so limited so as effectively to suspend the writ as applied to Thuraissigiam. In doing so, the panel rejected the government's contention that because, in its view, Thuraissigiam lacks due process rights, there are no rights for the Suspension Clause to protect, explaining that *Boumediene* foreclosed that argument by holding that, whether or not due process was satisfied, the Suspension Clause might require more. Reviewing the relevant

precedent, the panel concluded that the Suspension Clause requires review of Thuraissigiam's claims.

The panel held that 8 U.S.C. § 1252(e)(2) violates the Suspension Clause as applied to Thuraissigiam. Noting the meager procedural protections afforded by the administrative scheme governing credible fear determinations in this context, and the fact that § 1252(a)(2) prevents any judicial review of whether DHS complied with the procedures in an individual case or applied the correct standard, the panel concluded that it is obvious that the constitutional minimum – whether Thuraissigiam was detained pursuant to the "erroneous interpretation or application of relevant law" – is not satisfied by the scheme set out by § 1252(e)(2).

The panel further declined to interpret § 1252(e)(2) to avoid the serious Suspension Clause problems engendered by the statute, explaining that the constitutional avoidance canon does not apply because the statute cannot bear a reading that avoids the constitutional problems it creates.

Finally, the panel observed that it did not profess to decide in this opinion what right or rights Thuraissigiam may vindicate via use of the writ, and remanded the case for the district court to exercise jurisdiction to consider Thuraissigiam's legal challenges to the procedures leading to his expedited removal order.

**COUNSEL**

Lee P. Gelernt (argued) and David Hausman, American Civil Liberties Union Foundation Immigrants' Rights Project, New York, New York; Jennifer Chang Newell and Cody Wofsy, American Civil Liberties Union Foundation Immigrants' Rights Project, San Francisco, California; David Loy, ACLU Foundation of San Diego & Imperial Counties, San Diego, California; for Petitioner-Appellant.

Joshua S. Press (argued), and Joseph A. Darrow, Trial Attorneys; Erez Reuveni, Assistant Director; William C. Peachey, Director; Office of Immigration Litigation, Civil Division, United States Department of Justice, Washington, D.C.; for Respondent-Appellees.

Matthew E. Price, Jenner & Block, New York, New York; Blaine Bookey, Karen Musalo, and Eunice Lee, Center for Gender & Refugee Studies, University of California Hastings College of the Law, San Francisco, Calfornia; for Amici Curiae Refugee and Human Rights Organizations and Scholars.

Ethan D. Dettmer, Soolean Choy, Priyah Kaul, and Eli M. Lazarus, Gibson Dunn & Crutcher, San Francisco, California; Joshua S. Lipshutz, Gibson Dunn & Crutcher, Washington, D.C.; for Amici Curiae Scholars of Immigration Law.

Noah A. Levine, Wilmer Cutler Pickering Hale & Dorr, New York, New York, for Amici Curiae Scholars of Habeas Corpus Law.

Anjali Srinivasan and Leo L. Lam, Keker Van Nest & Peters, San Francisco, California, for Amici Curiae Scholars of Sri Lankan Politics.

___

**OPINION**

TASHIMA, Circuit Judge:

Vijayakumar Thuraissigiam filed a habeas petition in district court pursuant to 8 U.S.C. § 1252(e)(2) to challenge the procedures leading to his expedited removal order. The court dismissed the petition for lack of subject matter jurisdiction. We reverse. Although § 1252(e)(2) does not authorize jurisdiction over the claims in Thuraissigiam's petition, the Suspension Clause, U.S. Const. art. I, § 9, cl. 2, requires that Thuraissigiam have a "meaningful opportunity to demonstrate that he is being held pursuant to 'the erroneous application or interpretation' of relevant law." *Boumediene v. Bush*, 553 U.S. 723, 779 (2008) (quoting *INS v. St. Cyr*, 533 U.S. 289, 302 (2001)). Because § 1252(e)(2) does not provide that meaningful opportunity, the provision violates the Suspension Clause as applied to Thuraissigiam.

**BACKGROUND**

**I.  Statutory Background**

When a U.S. Customs and Border Protection ("CBP") officer determines that a noncitizen arriving at a port of entry is inadmissible for misrepresenting a material fact or lacking

necessary documentation,[1] the officer must place the noncitizen in so-called "expedited removal" proceedings. 8 U.S.C. § 1225(b)(1)(A)(i). By regulation, the Department of Homeland Security ("DHS"), of which CBP is a constituent agency, also applies expedited removal to inadmissible noncitizens arrested within 100 miles of the border and unable to prove that they have been in the United States for more than the prior two weeks. Designating Aliens for Expedited Removal, 69 Fed. Reg. 48877-01, 48879-80 (Aug. 11, 2004);[2] *see also* 8 U.S.C. § 1225(b)(1)(A)(iii)(II).

DHS removes noncitizens eligible for expedited removal "without further hearing or review," subject to only one exception. 8 U.S.C. § 1225(b)(1)(A)(i). If, in an interview with a CBP officer, the noncitizen indicates an intent to apply for asylum or a fear of persecution, DHS must refer the noncitizen for an interview with an asylum officer. *Id.* § 1225(b)(1)(A)(ii); 8 C.F.R. § 208.30. If that asylum officer determines that the noncitizen's fear of persecution is

---

[1] *See* 8 U.S.C. § 1182(a)(6)(C) (misrepresentation bar); *id.* § 1182(a)(7) (documentation bar).

[2] Congress gave the Attorney General the authority to extend expedited removal to some or all inadmissible noncitizens who cannot prove that they have been in the United States for more than two years prior; thus, the current regime does not represent the full exercise of executive authority permitted by statute. 8 U.S.C. § 1225(b)(1)(A)(iii). DHS also applies expedited removal to noncitizens who entered the United States by sea and who have not been in the United States for two years. *See* Notice Designating Aliens Subject to Expedited Removal Under Section 235(b)(1)(A)(iii) of the Immigration and Nationality Act, 67 Fed. Reg. 68,924, 68,924–25 (Nov. 13, 2002). The current regime may, however, expand; a January 2017 executive order instructs the Secretary of DHS to apply expedited removal to the fullest extent of the law. *See* Exec. Order No. 13,767, 82 Fed. Reg. 8793 (Jan. 25, 2017).

credible, the noncitizen is referred to non-expedited removal proceedings, in which the noncitizen may apply for asylum or other forms of relief from removal. *See* 8 U.S.C. § 1225(b)(1)(B)(ii); 8 C.F.R. § 208.30(f); 8 C.F.R. § 1003.42(f). If the asylum officer finds no credible fear of persecution, the noncitizen will be removed. 8 U.S.C. § 1225(b)(1)(B)(iii). A supervisor reviews the asylum officer's credible fear determination, 8 C.F.R. §§ 208.30(e)(7), 235.3(b)(2), (b)(7), and a noncitizen may also request de novo review by an immigration judge ("IJ"). 8 U.S.C. § 1225(b)(1)(B)(iii)(III); 8 C.F.R. § 1003.42. In 2016, DHS conducted over 141,000 expedited removals. *See* Refugee and Human Rights Amicus Br. 10. All individuals placed in expedited removal proceedings are subject to mandatory detention pending a final determination of credible fear of persecution or until they are removed. 8 U.S.C. § 1225(b)(1)(B)(iii)(IV).

Congress sharply circumscribed judicial review of the expedited removal process. "[N]o court shall have jurisdiction to review . . . any individual determination [or] . . . the application of [§ 1225(b)(1)] to individual aliens" outside of the review permitted by the habeas review provision, § 1252(e). 8 U.S.C. § 1252(a)(2)(A)(iii). Under § 1252(e)(2), a person in expedited removal proceedings may file a habeas petition in federal district court to contest three DHS determinations: whether the person is a noncitizen, whether he "was ordered removed" via expedited removal, and whether he is a lawful permanent resident or has another status exempting him from expedited removal. *Id.* § 1252(e)(2)(A)–(C). Review of whether a petitioner "was ordered removed" is "limited to whether such an order in fact was issued and whether it relates to the petitioner. *Id.* § 1252(e)(5). "There shall be no review of whether the alien

is actually inadmissible or entitled to any relief from removal." *Id.*; *see also* 8 C.F.R. § 1003.42(f) ("No appeal shall lie from a review of an adverse credible fear determination made by an immigration judge.").[3]

## II. Factual Background

Thuraissigiam is a native and citizen of Sri Lanka and a Tamil, an ethnic minority group in Sri Lanka. *See* Scholars of Sri Lankan Politics Amicus Br. 3. Thuraissigiam fled his home country in June 2016 and made his way to Mexico. On February 17, 2017, Thuraissigiam crossed the border into the United States. Late that night, he was arrested by a CBP officer four miles west of the San Ysidro, California, port of entry, 25 yards north of the border.

DHS placed Thuraissigiam in expedited removal proceedings. Pursuant to 8 U.S.C. § 1225(b)(1)(A)(ii), CBP referred Thuraissigiam for an interview with an asylum officer after he indicated a fear of persecution in Sri Lanka. On March 9, an asylum officer from the United States Citizenship and Immigration Services ("USCIS") interviewed Thuraissigiam and determined that he had not established a credible fear of persecution. A supervisor approved the

---

[3] Under 8 U.S.C. § 1252(e)(3), a person may challenge the constitutionality and legality of the expedited removal provisions, regulations implementing those provisions, or written policies to implement the provisions. Such challenges, however, must be brought within 60 days after implementation and only in the District of Columbia. *Id.* § 1252(e)(3)(A)–(B). Various expedited removal provisions and implementing regulations survived a § 1252(e)(3) challenge in *American Immigration Lawyers Ass'n v. Reno*, 18 F. Supp. 2d 38 (D.D.C. 1998), although the plaintiffs did not raise a Suspension Clause argument about the extent of habeas review. *See id.* at 41.

decision. Thuraissigiam then requested review by an IJ, who affirmed the negative credible fear finding in a check-box decision and returned the case to DHS for Thuraissigiam's removal.

## III.    District Court Proceedings

In January 2018, Thuraissigiam filed a habeas petition in federal district court, naming as respondents DHS, several of its constituent agencies, and individual agency officials. Thuraissigiam argued that his "expedited removal order violated his statutory, regulatory, and constitutional rights," sought to vacate the order, and requested relief in the form of a "new, meaningful opportunity to apply for asylum and other relief from removal." Thuraissigiam alleged that in Sri Lanka he had been harassed for supporting a Tamil political candidate. In 2007, he was "detained and beaten" by Sri Lankan army officers, and told not to support the candidate. In 2014, after Thuraissigiam continued to support the candidate, government intelligence officers kidnapped, bound, and beat him during an interrogation about his political activities. Thuraissigiam alleged that he "was lowered into a well, simulating drowning, threatened with death, and then suffocated, causing him to lose consciousness."

Thuraissigiam also made various factual allegations about the expedited removal procedures to which he was subject after being apprehended. For one, he alleged that the asylum officer failed to "elicit all relevant and useful information bearing on whether the applicant has a credible fear of persecution or torture" in violation of 8 C.F.R. § 208.30(d) and "failed to consider relevant country conditions evidence" in violation of 8 U.S.C. § 1225(b)(1)(B)(v) and 8 C.F.R.

§ 208.30(e)(2). Thuraissigiam also alleged that there were "communication problems" between the asylum officer, Thuraissigiam, and the translator, in violation of 8 C.F.R. § 208.30(d)(1)–(2). Thuraissigiam alleged that the IJ hearing included the same procedural and substantive flaws, and that at both hearings, he was unaware whether "information he offered would be shared with the Sri Lankan government." Thuraissigiam's petition asserted two causes of action:

First, DHS' credible fear screening deprived Thuraissigiam "of a meaningful right to apply for asylum" and other forms of relief, in violation of 8 U.S.C. § 1225(b)(1), its implementing regulations, and the United States Convention Against Torture, implemented in the Foreign Affairs Reform and Restructuring Act of 1998 ("FARRA"), Pub. L. No. 105-277, div. G., Title XXII, § 2242, 112 Stat. 2681 (1998). The asylum officer and IJ also violated those statutes "by applying an incorrect legal standard" to Thuraissigiam's credible fear application.

Second, the asylum officer and IJ violated Thuraissigiam's rights under the Due Process Clause of the Fifth Amendment by "not providing him with a meaningful opportunity to establish his claims, failing to comply with the applicable statutory and regulatory requirements, and in not providing him with a reasoned explanation for their decisions."

The district court dismissed the habeas petition for lack of subject matter jurisdiction. *Thuraissigiam v. U.S. Dep't of Homeland Sec.*, 287 F. Supp. 3d 1077 (S.D. Cal. 2018). Relying on our precedents, the district court concluded that 8 U.S.C. § 1252(e) did not authorize jurisdiction over the claims in Thuraissigiam's petition. *Id.* at 1082. Next, the

court rejected Thuraissigiam's Suspension Clause arguments. Although the court concluded that Thuraissigiam could invoke the Suspension Clause, it held that the statute's "strict restraints" on habeas review of expedited removal orders did not effectively suspend the writ of habeas corpus and were therefore constitutionally sound. *Id.* at 1082–83.**[4]**

Thuraissigiam timely appealed the district court's dismissal and moved for a stay of removal pending appeal. A motions panel of our court initially denied Thuraissigiam's stay motion, but later vacated that order and stayed Thuraissigiam's removal pending appeal.

## STANDARD OF REVIEW

We have jurisdiction under 28 U.S.C. § 1291. We review de novo the district court's dismissal of Thuraissigiam's habeas petition for lack of subject matter jurisdiction. *Bishop Paiute Tribe v. Inyo County*, 863 F.3d 1144, 1151 (9th Cir. 2017); *see also Garcia de Rincon v. Dep't of Homeland Sec.*, 539 F.3d 1133, 1136 (9th Cir. 2008).

## DISCUSSION

We must decide whether a federal district court has jurisdiction to review the claims in Thuraissigiam's petition. We first inquire whether 8 U.S.C. § 1252(e)(2) authorizes jurisdiction over Thuraissigiam's petition. Concluding that § 1252(e)(2) does not authorize jurisdiction, we then address

---

**[4]** The district court also denied various stay motions that Thuraissigiam had filed, concluding that they were moot due to the petition's dismissal. 287 F. Supp. 3d at 1078.

whether the provision restricting habeas review violates the Suspension Clause.

## I.  Jurisdiction Under 8 U.S.C. § 1252(e)(2)

Thuraissigiam contends that 8 U.S.C. § 1252(e)(2)(B) authorizes review of the statutory, regulatory, and constitutional claims raised in his habeas petition.  We disagree. Section 1252(e)(2), including Subsection (B), limits a district court to reviewing three basic factual determinations related to an expedited removal order.  Because Thuraissigiam's petition does not challenge any of those determinations, § 1252(e)(2) does not authorize jurisdiction over the petition.

A court applying habeas review under § 1252(e)(2) is limited to determining:

> (A) whether the petitioner is an alien,
>
> (B) whether the petitioner was ordered removed under such section, and
>
> (C) whether the petitioner can prove by a preponderance of the evidence that the petitioner is an alien lawfully admitted for permanent residence, has been admitted as a refugee under section 1157 of this title, or has been granted asylum under section 1158 of this title . . . .

Congress also provided express limitations on review under Subsection (B):

> In determining whether an alien has been ordered removed under section 1225(b)(1) of this title, the court's inquiry shall be limited to whether such an order in fact was issued and whether it relates to the petitioner. There shall be no review of whether the alien is actually inadmissible or entitled to any relief from removal.

*Id.* § 1252(e)(5). Nonetheless, Thuraissigiam stakes his claim on Subsection (B).

We considered and rejected a nearly identical argument in *Garcia de Rincon*. The petitioner in *Garcia de Rincon* raised a due process challenge to an expedited removal order. 539 F.3d at 1136. Characterizing § 1252(e) as among the "most stringent" jurisdiction-limiting provisions in the immigration statutes, we held that § 1252(e)(2) permits review only of "habeas petitions alleging that the petitioner is not an alien or was never subject to an expedited removal order." *Id.* at 1135, 1139. We therefore lacked jurisdiction because the petitioner's due process claims were not encompassed by those enumerated grounds. *Id.* at 1139. Likewise, Thuraissigiam's claims of procedural violations are plainly not claims about whether Thuraissigiam "was never subject to an expedited removal order." 8 U.S.C. § 1252(e).

Thuraissigiam contends that such a reading of Subsection (B) renders superfluous the prohibition in § 1252(e)(5) against "review of whether the alien is actually inadmissible or entitled to any relief from removal." However, § 1252(e)(5) functions not to repeat § 1252(e)(2)(B), but to explain it. Moreover, Thuraissigiam's petition is barred by the first sentence in § 1252(e)(5), not the second sentence.

Because he asks the district court to review the government's procedures, those claims are beyond the scope of "whether such an [expedited removal] order in fact was issued and whether it relates to the petitioner."[5]  8 U.S.C. § 1252(e); *see also United States v. Barajas-Alvarado*, 655 F.3d 1077, 1082 (9th Cir. 2011) (reaffirming that jurisdiction under § 1252(e)(2) "does not extend to review of the claim that an alien was wrongfully deprived of the administrative review permitted under the statute and applicable regulations").

Thuraissigiam relies on *Smith v. U.S. Customs & Border Protection*, 741 F.3d 1016 (9th Cir. 2014), to contend that we have adopted a more expansive view of Subsection (B). Specifically, he contends that *Smith* reviewed "whether the petitioner belonged in the expedited removal system," and that a court may thus review his petition.  *Smith*, however, does not support Thuraissigiam's argument.  In *Smith*, CBP placed the petitioner, a Canadian citizen arriving at the border, in expedited removal proceedings for lacking certain documents.  *Id.* at 1019.  The petitioner alleged that CBP exceeded its authority under the expedited removal statute because certain document requirements are waived for Canadians, and argued that Subsection (B) authorized review. *Id.* at 1019, 1021.  "Accepting [petitioner's] theory at face value," we reviewed whether CBP in fact classified him as an "intending immigrant."  *Id.* at 1021. Concluding that CBP had done so, we held that § 1252(e)(2) "permit[ted] us to go no

---

[5] Thuraissigiam also makes a structural argument, contending that because Congress provided for some review of asylum claims even in expedited removal cases, Congress must not have intended to strip judicial review to "police the boundaries of those limits."  This argument ignores the plain language of the statute, which evidences Congress' intent to do just that.

further" and did not discuss the merits of CBP's classification. *Id.* at 1021–22 & n.4.[6] Therefore, *Smith* reviewed only how CBP classified the petitioner, which is fairly encompassed by whether "[the petitioner] was ordered removed" under the expedited removal provision. *Id.* at 1022 (internal quotation marks omitted). By contrast, Thuraissigiam asks the district court to pass judgment on the procedures leading to his removal order. The limited review provided under § 1252(e)(2) does not encompass such claims.[7]

Therefore, in line with our precedents, we conclude that § 1252(e) does not authorize habeas review of Thuraissigiam's petition. We do not here address Thuraissigiam's request that we apply the canon of constitutional avoidance to interpret § 1252(e) to provide jurisdiction over his legal claims. That canon only comes into play if we conclude that § 1252(e) raises serious constitutional questions; thus, we first address Thuraissigiam's Suspension Clause argument before contemplating the application of that canon. *See St. Cyr*, 533 U.S. at 299–300, 314 (explaining constitutional avoidance canon and applying it upon concluding that the statute in question raised serious constitutional questions).

---

[6] The *Smith* petitioner also contended that § 1252(e)(2) violated the Suspension Clause, but we did not reach the argument because we held that the statute permitted limited review of his petition. 741 F.3d at 1022 n.6.

[7] We have held that in appeals from convictions for criminal reentry, a defendant may collaterally attack a removal order that forms the basis for his conviction. *See United States v. Ochoa-Oregel*, 904 F.3d 682, 686 (9th Cir. 2018) (considering collateral attack on expedited removal order). But that rule does not apply to this case.

## II. Suspension Clause

The Suspension Clause mandates, "The Privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it." U.S. Const. art. I, § 9, cl. 2. Our nation's founders viewed the writ as a "vital instrument" to secure individual liberty. *Boumediene*, 553 U.S. at 743. "The Clause protects the rights of the detained by a means consistent with the essential design of the Constitution. It ensures that, except during periods of formal suspension, the Judiciary will have a time-tested device, the writ, to maintain the 'delicate balance of governance' that is itself the surest safeguard of liberty." *Id.* at 745 (citing *Hamdi v. Rumsfeld*, 542 U.S. 507, 536 (2004) (opinion of O'Connor, J.)). The Suspension Clause prevents Congress from passing a statute that effectively suspends the writ absent rebellion or invasion. *See Felker v. Turpin*, 518 U.S. 651, 663–64 (1996). Thus, the question in this case is whether 8 U.S.C. § 1252(e)(2) effectively suspends the writ. Put another way, the question is whether the habeas review available to Thuraissigiam under § 1252(e)(2) satisfies the requirements of the Suspension Clause.

The Supreme Court has not yet answered that question. In fact, the Court has rarely addressed who may invoke the Suspension Clause and the extent of review the Clause requires. For example, only in *Boumediene* has the Court concluded that a statute violated the Suspension Clause. Gerald L. Neuman, *The Habeas Corpus Suspension Clause After* Boumediene v. Bush, 110 Colum. L. Rev. 537, 538 (2010). In the Court's other most recent Suspension Clause case, *St. Cyr*, the Court, after extensive analysis of the Suspension Clause issues at play, interpreted the statute to

avoid those issues.  533 U.S. at 336–37.  Of the federal courts of appeals, only the Third Circuit has addressed the precise question before us, whether § 1252(e)(2) as applied to noncitizen petitioners in expedited removal violates the Suspension Clause.  *See Castro v. U.S. Dep't of Homeland Sec.*, 835 F.3d 422 (3d Cir. 2016) (concluding that, due to their status, such petitioners could not invoke the Suspension Clause), *cert. denied*, 137 S. Ct. 1581 (2017).

*Boumediene* traced the writ of habeas corpus to its origins as a tool of the English crown, citing the detailed historical account in Paul D. Halliday and G. Edward White, *The Suspension Clause: English Text, Imperial Contexts, and American Implications*, 94 Va. L. Rev. 575 (2008).  553 U.S. at 740.  As Halliday and White explain, the writ in England was the vehicle "to determine the rightness of constraints imposed on the bodies of the king's subjects of all kinds."  94 Va. L. Rev. at 607.  The writ was on occasion suspended in England.  *Id.* at 619; *see Boumediene*, 553 U.S. at 741. According to *Boumediene*, that history "no doubt confirmed [the Framers'] view that pendular swings to and away from individual liberty were endemic to undivided, uncontrolled power."  *Id.* at 742;  *see also* Amanda L. Tyler, *A "Second Magna Carta": The English Habeas Corpus Act and the Statutory Origins of the Habeas Privilege*, 91 Notre Dame L. Rev. 1949, 1985–86 (2016) (describing how suspensions of the writ in colonial America motivated the States' desire to import similar habeas protections after gaining independence); Halliday & White, 94 Va. L. Rev. at 671 (highlighting the Framers' desire to restore "the traditional order of writs and suspensions").

As *Boumediene* summed it up, the Suspension Clause is rooted in the Framers' first-hand experience "that the

common-law writ all too often had been insufficient to guard against the abuse of monarchial power." 553 U.S. at 739–40. The Clause, therefore, is "not merely about suspending the privilege of the writ of habeas corpus, but about the meaning of the 'privilege of the writ' itself." Halliday & White, 94 Va. L. Rev. at 699. "Indeed, common law habeas corpus was, above all, an adaptable remedy . . . [whose] precise application and scope changed depending upon the circumstances." *Boumediene*, 553 U.S. at 779–80 (citing, *inter alia*, Richard H. Fallon, Jr. & Daniel J. Meltzer, *Habeas Corpus Jurisdiction, Substantive Rights, and the War on Terror*, 120 Harv. L. Rev. 2029, 2102 (2007)).

In examining how the Supreme Court has defined the Suspension Clause's requirements, *Boumediene* is our starting point, even if it does not provide a direct answer to Thuraissigiam's challenge. *Boumediene* and its predecessors, like *St. Cyr*, do provide an analytical blueprint. We therefore review those precedents before deciding how best to apply their principles to this appeal.

## A.  *Boumediene v. Bush*

In *Boumediene*, the Supreme Court struck down a War on Terror-era law after detainees at the Guantanamo Bay prison in Cuba brought a Suspension Clause challenge. 553 U.S. at 732–33. In the wake of the September 11, 2001, attacks, the U.S. Department of Defense created Combatant Status Review Tribunals ("CSRTs") to decide if detainees were "enemy combatants." *Id.* at 733. The *Boumediene* petitioners, who had all appeared before CSRTs and been deemed enemy combatants, sought a writ of habeas corpus under the general habeas statute, 28 U.S.C. § 2241. *Id.* at 734. After protracted litigation, Congress passed the

Detainee Treatment Act of 2005 ("DTA"), which amended
§ 2241 to bar judicial review of habeas petitions filed by
Guantanamo detainees and to vest review of CSRT decisions
exclusively in the D.C. Circuit. *Id.* at 735 (citing DTA
§ 1005(e), 119 Stat. 2742). Section 7 of the Military
Commissions Act of 2006 ("MCA") made those provisions
retroactive. *Id.* at 736. *See generally Hamad v. Gates*,
732 F.3d 990, 996–99 (9th Cir. 2013) (describing
*Boumediene*'s place in the line of Guantanamo detainee
cases). The Court took a two-step approach to evaluating the
detainees' challenge to the MCA.

At step one, the Court evaluated whether the Guantanamo
detainees – as enemy combatants detained on foreign soil –
could even invoke the Suspension Clause. *See Boumediene*,
553 U.S. at 739. In so doing, the Court affirmed that
although the writ's protections may have expanded since the
Constitution's drafting, "at the absolute minimum," the
Clause protects the writ as it existed in 1789. *Id.* at 746
(citing *St. Cyr*, 533 U.S. at 301). The Court therefore
examined historical authorities to determine the scope of the
writ in 1789, and whether it ran to "an enemy alien detained
abroad." *Id.* at 752. Although noting that "at common law a
petitioner's status as an alien was not a categorical bar to
habeas corpus," the Court concluded that the historical record
did not provide a definitive answer. *Id.* at 747, 752. Instead,
the Court turned to its extraterritoriality precedents and from
them concluded that "questions of extraterritoriality turn on
objective factors and practical concerns, not formalism." *Id.*
at 764. *Boumediene* drew from *Johnson v. Eisentrager*,
339 U.S. 763 (1950), another case about the extraterritorial
application of the Suspension Clause, three non-exclusive
factors relevant to the Clause's extraterritorial scope:

> (1) the citizenship and status of the detainee and the adequacy of the process through which that status determination was made; (2) the nature of the sites where apprehension and then detention took place; and (3) the practical obstacles inherent in resolving the prisoner's entitlement to the writ.

553 U.S. at 766.[8]    Applying those factors, the Court concluded that the detainees could invoke the Suspension Clause. *Id.* at 771.

At step two, the Court considered whether Congress had suspended the writ without an adequate substitute. The Court acknowledged that there are "few precedents addressing what features an adequate substitute for habeas corpus must contain." *Id.* at 772. For example, the Court had previously upheld provisions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") against a Suspension Clause challenge because the provisions "did not constitute a substantial departure from common-law habeas procedures." *Id.* at 774 (citing *Felker*, 518 U.S. at 664); *see also* Neuman, 110 Colum. L. Rev. at 542 (stating that "what matters is the substance, not the form, of the Great Writ," and that "Congress can rename or reconfigure the procedure by which courts examine the lawfulness of detention," as long as the substitute is adequate).

---

[8] In *Rasul v. Bush*, 542 U.S. 466 (2004), the Court had first discussed *Eisentrager*'s applicability to the question of who may invoke the Suspension Clause. *Id.* at 487 (Kennedy, J., concurring) ("A faithful application of *Eisentrager*, then, requires an initial inquiry into the general circumstances of the detention to determine whether the Court has the authority to entertain the petition and to grant relief after considering all of the facts presented.").

In *Boumediene*, the Court gleaned from its precedents two "easily identified attributes of any constitutionally adequate habeas corpus proceeding." 553 U.S. at 779. First, the "privilege of habeas corpus entitles the prisoner to a meaningful opportunity to demonstrate that he is being held pursuant to 'the erroneous application or interpretation' of relevant law." *Id.* (quoting *St. Cyr*, 533 U.S. at 302). Second, "the habeas court must have the power to order the conditional release of an individual unlawfully detained." *Id.* Beyond those minimum requirements, "depending on the circumstances, more may be required." *Id.*

The Court further emphasized that "the necessary scope of habeas review in part depends upon the rigor of any earlier proceedings." *Id.* at 781; *see also id.* at 786 (noting that "habeas corpus review may be more circumscribed if the underlying detention proceedings are more thorough"). For that reason, courts sitting in habeas afford deference when reviewing another court's decision, but when a petitioner is "detained by executive order . . . the need for collateral review is most pressing." *Id.* at 783. To be effective, the "habeas court must have sufficient authority to conduct a meaningful review of both the cause for detention and the Executive's power to detain." *Id.* Applying those principles to the CSRTs and D.C. Circuit review, the Court concluded that the MCA did not provide an adequate substitute because the D.C. Circuit could not "consider newly discovered evidence that could not have been made part of the CSRT record." *Id.* at 790. The Court then concluded that it was not possible to read into the statute provisions for the procedures necessary to satisfy the Suspension Clause, and therefore held it unconstitutional. *Id.* at 792.

*Boumediene* provides an analytical template for evaluating a Suspension Clause challenge:  at step one, we examine whether the Suspension Clause applies to the petitioner; and, if so, at step two, we examine whether the substitute procedure provides review that satisfies the Clause. How more specifically to apply that template is less clear, given that the Court generated its three-factor test at step one in light of the extraterritoriality question in *Boumediene. See id.* at 764, 766.  Those factors, as both parties acknowledge, do not map precisely onto this case because Thuraissigiam was apprehended and is detained on U.S. soil.[9]  Yet, the manner in which the Court divined those factors informs our approach here.  *Boumediene* relied on *Eisentrager* and related cases, but also looked to 1789-era application of the writ to determine whether petitioners similarly situated to Guantanamo detainees had been able to invoke the Clause. Although the Court emphasized that the history was not dispositive, it made clear that "settled precedents or legal commentaries in 1789 . . . can be instructive."  *Id.* at 739.[10]

---

[9] We too have applied the three *Boumediene* factors more readily when asking whether a noncitizen outside the United States – again, unlike Thuraissigiam – can claim the Constitution's protections.  *See Ibrahim v. Dep't of Homeland Sec.*, 669 F.3d 983, 995 (9th Cir. 2012) (evaluating extraterritoriality in context of First and Fifth Amendment claims).

[10] Indeed, the Supreme Court's proposition that the Suspension Clause at least protects the writ as it existed in 1789 "necessarily invites reference to history when interpreting and applying the Suspension Clause." Amanda L. Tyler, *Habeas Corpus in Wartime* 9 (2017); *see also Omar v. McHugh*, 646 F.3d 13, 19 (D.C. Cir. 2011) (Kavanaugh, J.) ("[H]istory matters:  In habeas cases, we seek guidance from history 'addressing the specific question before us.'" (quoting *Boumediene*, 553 U.S. at 746)).

At step two, *Boumediene* held that, at a minimum, the Suspension Clause entitles a petitioner "to a meaningful opportunity to demonstrate he is being held to 'the erroneous application or interpretation' of relevant law." *Id.* at 779 (quoting *St. Cyr*, 533 U.S. at 302). In considering whether the Clause required more in the circumstances of *Boumediene*, the Court impliedly considered the rigor and character of the proceedings preceding habeas review. Also relevant to Thuraissigiam's case, the Court affirmed that the Suspension Clause protects "a right of first importance," even in circumstances – such as national security, in *Boumediene* – where the executive's power is at its zenith. *Id.* at 797–98.

## B. *INS v. St. Cyr*

*St. Cyr*, which predated *Boumediene* by several years, sheds additional light on the Court's approach to Suspension Clause questions. The petitioner, St. Cyr, was a lawful permanent resident admitted to the United States in 1986. 533 U.S. at 293. In 1996, St. Cyr pleaded guilty to a criminal charge that made him removable, although under pre-AEDPA law (applicable at the time of his conviction), he was eligible for a discretionary waiver from the Attorney General. *Id.* After AEDPA was passed, the government began removal proceedings, with the Attorney General interpreting AEDPA to have removed his discretion to grant St. Cyr a waiver. *Id.* St. Cyr filed a habeas petition alleging that the Attorney General's interpretation was erroneous because St. Cyr's conviction predated AEDPA. *Id.* After the district court and Second Circuit agreed with St. Cyr, the government argued to

the Supreme Court that the courts lacked jurisdiction to review the Attorney General's interpretation. *Id.* at 297–98.

The Court stated that the government's position had to overcome several presumptions, chief among them the "strong presumption in favor of judicial review of administrative action and the longstanding rule requiring a clear statement of congressional intent to repeal habeas jurisdiction." *Id.* at 298 (citing *Ex parte Yerger*, 75 U.S. (8 Wall.) 85, 102 (1869)). To address whether the statute raised serious Suspension Clause questions, the Court started from the principle that "[b]ecause of [the] Clause, some 'judicial intervention in deportation cases' is unquestionably 'required by the Constitution.'" *Id.* at 300 (citing *Heikkila v. Barber*, 345 U.S. 229, 235 (1953)). Because "at the absolute minimum, the Suspension Clause protects the writ 'as it existed in 1789,'" the Court looked at the writ's application before and after the drafting of the Constitution. *Id.* at 301 (quoting *Felker*, 518 U.S. at 663–64). Legal and historical authorities indicated that in both England and the United States "the writ of habeas corpus has served as a means of reviewing the legality of Executive detention, and it is in that context that its protections have been strongest." *Id.* Moreover, the writ was available both to "nonenemy aliens as well as citizens" and "encompassed detentions based on errors of law, including the erroneous application or interpretation of statutes." *Id.* at 301–02.

*St. Cyr* also looked to the so-called "finality era,"[11] during which the statutory scheme precluded judicial intervention in immigration enforcement, except as required by the Constitution. *Id.* at 304–06. Despite that statutory bar, the Court in the finality era "allow[ed] for review on habeas of questions of law." *Id.* at 304. Accordingly, the government's reading of the statute – to prohibit *any* judicial review of the Attorney General's interpretation – raised "Suspension Clause questions that . . . are difficult and significant." *Id.* More directly, "to conclude that the writ is no longer available in this context would represent a departure from historical practice in immigration law." *Id.* at 305. After canvassing that historical practice, and noting that it was consistent with the writ's "common-law antecedents," the Court concluded that St. Cyr could have brought his habeas claims under that regime. *Id.* at 308. Thus, due to the serious constitutional questions raised, and because Congress had not provided a "clear, unambiguous, and express" intent to preclude habeas jurisdiction over questions of law, the Court concluded that the statutes at issue did not repeal habeas jurisdiction. *Id.* at 314.

*St. Cyr* further illuminates how to approach both *Boumediene* steps. Like *Boumediene*, *St. Cyr* looked to the 1789-era historical application of the writ. *St. Cyr* also looked to the finality era because it provides evidence of what

---

[11] The "finality era" refers to "an approximately sixty-year period when federal immigration law rendered final (hence, the 'finality' era) the Executive's decisions to admit, exclude, or deport noncitizens. This period began with the passage of the Immigration Act of 1891, ch. 551, 26 Stat. 1084, and concluded when Congress enacted the Immigration and Nationality Act of 1952, Pub. L. No. 82-414, 66 Stat. 163, which permitted judicial review of deportation orders through declaratory judgment actions in federal district courts." *Castro*, 835 F.3d at 436.

degree of habeas review is required under the Suspension Clause and to whom such review is guaranteed in the immigration enforcement context. *St. Cyr*'s resort to prior habeas cases aligns with *Boumediene*'s similar reliance on *Eisentrager* to resolve ambiguities in the 1789-era application of the writ. That *St. Cyr* ultimately avoided the Suspension Clause question does not diminish its wisdom or relevance as an example of the Court's analytical *approach* to Suspension Clause questions. Consistent with *Boumediene* and *St. Cyr*, we conclude that both the common-law history of the writ and the Court's finality era cases are relevant to what and whom the Suspension Clause protects. *See also Flores-Miramontes v. INS*, 212 F.3d 1133, 1141–43 (9th Cir. 2000) (relying on common-law history and finality era cases in addressing Suspension Clause challenge); *see also Trinidad y Garcia v. Thomas*, 683 F.3d 952, 960 (9th Cir. 2012) (en banc) (Thomas, J., concurring) (discussing finality era cases as evidence of rights protected by the Suspension Clause).

## C.  The Third Circuit's Decision in *Castro*

Before addressing Thuraissigiam's Suspension Clause challenge, we discuss the Third Circuit's decision in *Castro*, which involved an analogous challenge to § 1252(e).[12] The

---

[12] The government's contention that the Second and Seventh Circuits have addressed the question before us is incorrect. Neither case addresses the Suspension Clause. *See Shunaula v. Holder*, 732 F.3d 143, 147 (2d Cir. 2013) (addressing due process challenge to § 1252(e)(2) and § 1252(a)(2)(A)); *Khan v. Holder*, 608 F.3d 325, 328 (7th Cir. 2010) (addressing § 1252(e)(2) in light of that circuit's "safety valve" doctrine for "judicial correction of bizarre miscarriages of justice"). Likewise, the case cited in the government's Rule 28(j) letter, *Hamama v. Adducci*, 912 F.3d 869 (6th Cir. 2018), does not address the Suspension Clause in the context of the procedures leading up to an expedited removal order.

Third Circuit concluded that § 1252(e) does not violate the Suspension Clause as applied to 28 asylum-seeking families who, like Thuraissigiam, raised constitutional, statutory, and regulatory claims relating to their negative credible fear determinations. 835 F.3d at 425, 428. The families were all apprehended shortly after entering the country, placed in expedited removal, and found not to have credible fear. *Id.* at 427–28. As we do, the Third Circuit rejected the argument that § 1252(e)(2) provides jurisdiction over claims of legal error. *Id.* at 434.

Turning to the petitioners' Suspension Clause challenge, the court opined that the Supreme Court's habeas cases are "perhaps even competing" with the plenary power doctrine. *Id.* After reviewing *Boumediene* and *St. Cyr*, *Castro* discussed the Court's "commitment to the full breadth of [that] doctrine, at least as to aliens at the border seeking initial admission to the country." *Id.* at 443. *Castro* approached step one of *Boumediene* by reference to the petitioners' status in light of *Landon v. Plascencia*, 459 U.S. 21 (1982), a case addressing due process, not habeas, rights. *Castro* concluded that petitioners, as "recent surreptitious entrants," should be treated for constitutional purposes as "alien[s] seeking initial admission to the United States." 835 F.3d at 448. In *Landon*, the Court stated that such a noncitizen "has no constitutional rights regarding his application" for entry into the country. 459 U.S. at 32. Accordingly, the Third Circuit concluded that the petitioners' challenge failed at step one, and did not address whether § 1252(e) was an adequate habeas substitute. 835 F.3d at 446. The court acknowledged that its discussion of the petitioners' status "appear[ed] to ignore" Supreme Court precedent relating to the due process rights of noncitizens physically present in the country, but concluded that no case

had clearly held that "arriving aliens" were entitled to due process protections. *Id.* at 447–48.[13]

We disagree with *Castro*'s resolution of how *Boumediene* and *St. Cyr* require us to approach a Suspension Clause challenge. As explained at length above, the Court's mode of analysis in both of those cases addressed the scope of the Suspension Clause by reference to the writ as it stood in 1789 and relevant habeas corpus precedents. *Castro* explained that it did not rely on *St. Cyr*'s description of the Court's habeas approach in immigration cases in the finality era by emphasizing that, unlike the *Castro* petitioners, St. Cyr was a lawful permanent resident, and that *St. Cyr* discussed only what the Suspension Clause *might* protect. *Id.* at 446.

That *St. Cyr* did not affirmatively hold that the Suspension Clause was violated does not render its description of the finality era cases incorrect or its approach irrelevant. Moreover, *Castro*'s decision to rely instead on *Landon* is misplaced. *Landon* held that a permanent resident who traveled abroad and was detained when attempting to reenter the United States should be placed in exclusion

---

[13] After argument, the Third Circuit decided *Osorio-Martinez v. Attorney General*, 893 F.3d 153 (3d Cir. 2018), involving four juvenile petitioners from *Castro*. After their original habeas petitions were dismissed, the juveniles had been granted Special Immigrant Juvenile ("SIJ") status under 8 U.S.C. § 1108(a)(27)(J). *Id.* at 160. Applying *Castro*, the Third Circuit held that § 1252(e) was an unconstitutional suspension of the writ as applied to the petitioners, by virtue of their "significant ties to this country" and the constitutional and statutory rights flowing to SIJ designees under 8 U.S.C. § 1255(a) & (h)(1). *Id.* at 167.

proceedings rather than deportation. 459 U.S. at 22.[14]
Addressing the petitioner's due process challenge to her
exclusion proceedings, the Court noted it had "long held that
an alien seeking initial admission to the United States
requests a privilege and has no constitutional rights regarding
his application." *Id.* As explained by Judge Hardiman, the
Court in *Landon* did not "purport to resolve a jurisdictional
question raising the possibility of an unconstitutional
suspension of the writ of habeas corpus"; rather it addressed
only the due process rights of a permanent resident. *Castro*,
835 F.3d at 450 (Hardiman, J., concurring dubitante); *see
Landon*, 459 U.S. at 32–35. *Landon* could not and did not
address the much different question of whether a petitioner
like Thuraissigiam may invoke the Suspension Clause.[15]

Although often conflated, the rights protected by the
Suspension Clause are not identical to those under the Fifth
Amendment's guarantee of due process. *See* Lee Kovarsky,

---

[14] At the time, Congress provided that removable noncitizens in the
United States were subject to deportation and those seeking initial entry
were subject to exclusion. *Id.* at 25. Now all noncitizens are subject to
removal, whether via 8 U.S.C. § 1225(b)(1) expedited removal or the
removal procedures under 8 U.S.C. § 1229a.

[15] Regardless, we disagree with the government's contention and
*Castro*'s conclusion that a person like Thuraissigiam lacks all procedural
due process rights. *See* 835 F.3d at 447–48. The Supreme Court has been
clear that presence matters to due process. *See, e.g.*, *Mathews v. Diaz*,
426 U.S. 67, 77 (1976); *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001).
And we have held that a noncitizen situated almost exactly like
Thuraissigiam had a constitutional right "to expedited removal
proceedings that conformed to the dictates of due process." *United States
v. Raya-Vaca*, 771 F.3d 1195, 1203 (9th Cir. 2014); *see also* Immigration
Scholars Amicus Br. (explaining why Thuraissigiam has procedural due
process rights).

*Custodial and Collateral Process: A Response to Professor Garrett*, 98 Cornell L. Rev. Online 1, 1 (2013) ("Due process and the habeas privilege are distinct constitutional phenomena, [but] federal courts almost pathologically confuse them.").  It is true that, historically, the Fifth Amendment's due process guarantee and the Suspension Clause have been applied in tandem, as their applicability was rarely disputed.  *See* Mary Van Houten, *The Post-*Boumediene *Paradox: Habeas Corpus or Due Process?*, 67 Stan. L. Rev. Online 9, 10 (2014) (observing that these provisions "were almost always jointly applied before *Boumediene*").  But this fact does not mean these rights should be elided, as made clear by the fact that the Constitution, ratified two-and-a-half years before the Fifth Amendment, *see Bute v. People of State of Ill.*, 333 U.S. 640, 650 (1948), presupposed the existence of the writ of habeas corpus, *see Boumediene*, 553 U.S. at 739 ("Protection for the privilege of habeas corpus was one of the few safeguards of liberty specified in a Constitution that, at the outset, had no Bill of Rights.").  Indeed, the writ "is almost the only remedy mentioned in the Constitution" as originally ratified.  Fallon & Meltzer, 120 Harv. L. Rev. at 2037.

*Boumediene* itself clearly recognized the distinction between the Fifth Amendment's due process rights and the Suspension Clause – providing further reason not to treat *Landon*'s discussion of due process rights as having any bearing on the application of the Suspension Clause.  In *Boumediene*, the Court decided that the Guantanamo detainees could invoke the Suspension Clause without addressing whether they had due process rights or whether the CSRTs satisfied due process.  553 U.S. at 785; *see also id.* at 739 (starting from the proposition that "protection for the privilege of habeas corpus was one of the few safeguards of

liberty specified in a Constitution that, at the outset, had no Bill of Rights[]"); *Flores-Miramontes*, 212 F.3d at 1142 (noting that habeas was available at common law prior to the drafting of the Constitution). The Court in *Boumediene* therefore explicitly declined to link due process rights and Suspension Clause rights. *See Hamad*, 732 F.3d at 999 (noting that *Boumediene* did not address whether the due process clause applied to the Guantanamo detainees); *see also Kiyemba v. Obama*, 555 F.3d 1022, 1027 (D.C. Cir. 2009) (concluding on habeas review that Guantanamo detainees lacked due process rights), *vacated by* 559 U.S. 131 (2010), *reinstated by* 605 F.3d 1046, 1047 (D.C. Cir. 2010). *Landon*, a due process case, is not relevant to whether Thuraissigiam can invoke the Suspension Clause. For that reason, we decline to follow *Castro*'s approach and reject the government's argument that Thuraissigiam's purported lack of due process rights is determinative of whether he can invoke the Suspension Clause.

Instead, in accordance with *Boumediene*, we evaluate Thuraissigiam's Suspension Clause challenge in two steps: First, to determine whether Thuraissigiam may invoke the Suspension Clause, we examine 1789-era practice, the finality era cases, and other relevant precedents. Second, we ask whether § 1252(e)(2) provides Thuraissigiam a "meaningful opportunity to demonstrate that he is being held pursuant to 'the erroneous application or interpretation' of relevant law." *Boumediene*, 553 U.S. at 779. At step two, we keep in mind that the character of the earlier proceedings bears on the level of habeas review required. *Id.* at 781.

## III.    Application

### A.  *Garcia de Rincon* and *Pena*

At the outset, the government contends that our decisions in *Garcia de Rincon*, 539 F.3d 1133, and *Pena v. Lynch*, 815 F.3d 452 (9th Cir. 2016), require us to affirm.  Although in both cases we rejected arguments that § 1252(e)(2) authorized jurisdiction, neither case answered the constitutional question before us today.

In *Garcia de Rincon*, the petitioner was a noncitizen living in the United States who was stopped at the border attempting to reenter after a visit to Mexico, and placed in expedited removal.  539 F.3d at 1135.  After rejecting the petitioner's statutory challenge, we dismissed her argument – "although . . . not articulated" as such – that the Suspension Clause required review of her petition.  *Id.* at 1141.  The precise question considered was whether "the INA provides no adequate substitute for habeas review and therefore suspends the writ" – a *Boumediene* step two question, although *Garcia de Rincon* never addressed *Boumediene*, which had been decided months earlier.  *Id.*  We concluded that *Li v. Eddy*, 259 F.3d 1132 (9th Cir. 2001), *vacated on reh'g as moot*, 324 F.3d 1109 (9th Cir. 2003), discredited the petitioner's "generalized due process argument," the only right she sought to vindicate via her petition.  *Id.*  *Garcia de Rincon* says nothing about whether Thuraissigiam can invoke the Suspension Clause, whether the Clause requires habeas review of statutory or legal claims, or what the Clause requires for a petitioner like Thuraissigiam who is within the United States.  Instead, the case addressed only whether § 1252(e)(2) suspends the writ when a petitioner lacks due process rights.  Put in *Boumediene* step-two terms, the due

process clause was not "relevant law" for the *Garcia de Rincon* petitioner.[16]

*Pena* also did not settle the question before us. In *Pena*, a noncitizen placed in expedited removal filed a petition for review of the Board of Immigration Appeals' dismissal of his appeal from an IJ's decision affirming a negative credible fear determination. 815 F.3d at 454. Because the petition was not brought under § 1252(e)(2), we concluded that we lacked jurisdiction. *Id.* at 457. We went on to note that in *Webster v. Doe*, 486 U.S. 592, 603 (1988), the Court had "suggested that a litigant may be unconstitutionally denied a forum when there is absolutely *no* avenue for judicial review of a colorable claim of constitutional deprivation." 815 F.3d at 456 (emphasis in original). We concluded that Pena's petition did not raise *Webster* concerns because he lacked a colorable constitutional claim,[17] and further noted that § 1252(e)(2) provides "some avenues of judicial review." *Id.* at 456–57. All that *Pena* says, therefore, is that § 1252(e) does not implicate the *Webster* doctrine when a petitioner fails to raise colorable constitutional claims. *Pena* never addressed the Suspension Clause.

Because neither *Garcia de Rincon* nor *Pena* addressed whether § 1252(e)(2) unlawfully suspends the writ as applied

---

[16] In case there were any doubt, *Smith* subsequently reserved the question of whether, as applied to a noncitizen in expedited removal, the Suspension Clause requires review beyond that provided for in § 1252(e)(2). *See* 741 F.3d at 1022 n.6. That reservation necessarily determined that *Garcia de Rincon* had not settled the question.

[17] Pena claimed that the IJ violated due process by failing to elicit a voluntary waiver of his right to counsel, but we noted that that claim was contradicted by the record. *Id.* at 455–56.

to a petitioner like Thuraissigiam, we reject the government's argument that those cases alone require us to affirm.

## B. Reach of the Suspension Clause

At *Boumediene* step one, we must consider the reach of the Suspension Clause, or, in other words, whether Thuraissigiam is "barred from seeking the writ or invoking the protections of the Suspension Clause . . . because of [his] status . . . ." *Boumediene*, 553 U.S. at 739. In *Boumediene*, the Court answered this question by reference to its precedents and the common law history of the writ. We therefore do the same.[18]

---

[18] As described above, the Court in *Boumediene* generated a three-factor test at step one in light of the extraterritoriality question presented. This test does not clearly fit in the present case, given that Thuraissigiam was apprehended and detained in the United States. *See* 553 U.S. at 764, 766. However, even were we to apply *Boumediene*'s three-factor test here, it would, as in *Boumediene*, support application of the Suspension Clause.

The first factor, Thuraissigiam's "citizenship and status" and "the adequacy of the process through which that status determination was made," *Id.* at 766, weighs in favor of applying the Suspension Clause. Thuraissigiam is a foreign national who contests his status – he contends that he has a credible fear of persecution and therefore qualifies as a refugee entitled to asylum. Like the CRST process at issue in *Boumediene*, the determination as to whether a noncitizen has a credible fear is not made via a "rigorous adversarial process to test the legality of [his] detention." *Id.* at 767. The determination is made by an asylum officer, 8 C.F.R. § 208.30(d), and although the noncitizen may consult others and even have them present a statement at the end of the interview, 8 C.F.R. § 208.30(d)(4), other hallmarks of the adversarial process are lacking. If the noncitizen then chooses to contest an asylum officer's negative credible fear determination, the noncitizen is entitled only to cursory review by an IJ. 8 C.F.R. § 208.30(g); 8 C.F.R. § 1208.39(g)(2).

As explained, in *St. Cyr*, the Court canvassed cases from England and historical accounts to conclude that the writ was available before 1789 to "nonenemy aliens as well as to citizens." 533 U.S. at 301; *accord Boumediene*, 553 U.S. at 747 ("We know that at common law a petitioner's status as an

---

Critically, unlike in *Boumediene*, a noncitizen cannot seek review of the credible fear determination in an Article III court. *See* 8 U.S.C. § 1252(e)(2); *cf. Boumediene*, 553 U.S. at 767 ("And although the detainee can seek review of his status determination in the Court of Appeals, that review process cannot cure all defects in the earlier proceedings."). Accordingly, the procedural protections available to Thuraissigiam and other noncitizens in expedited removal "fall well short of the procedures and adversarial mechanisms that would eliminate the need for habeas corpus review." *Boumediene*, 553 U.S. at 767 (internal quotation marks omitted).

As to the second factor, there is no question that Thuraissigiam was apprehended and detained within the sovereign territory of the United States. This factor weighs strongly in favor of finding Thuraissigiam has rights under the Suspension Clause. *See id.* at 768–69. The government insists that the nature and length of a noncitizen's detention is relevant to this factor. Not so. *Boumediene* only invokes these considerations under step two. The second factor (under step one) is wholly focused on the level and duration of control exerted by the United States over the territory – which is not at issue here, where the territory is the United States. *Boumediene*, 553 U.S. at 768–69.

As in *Boumediene*, the third factor is somewhat equivocal: "there are costs to holding the Suspension Clause applicable in a case of [asylum-seekers in expedited removal proceedings.]" *Id.* at 769. But "[c]ompliance with any judicial process requires some incremental expenditure of resources," and direct review by the courts already exists and functions in non-expedited removal proceedings. *Id.* Thus, here, as in *Boumediene*, "[w]hile we are sensitive to [the government's] concerns, we do not find them dispositive." *Id.*

Consequently, *Boumediene*'s extraterritorial step one factors, if they were relevant here, would support application of the Suspension Clause.

alien was not a categorical bar to habeas corpus relief."); *Rasul*, 542 U.S. at 481 ("At common law, courts exercised habeas jurisdiction over the claims of aliens detained within sovereign territory of the realm. . . ."); *see also* Gerald L. Neuman, *Habeas Corpus, Executive Detention, and the Removal of Aliens*, 98 Colum. L. Rev. 961, 989–90 (1998) (collecting cases).

After the adoption of the Constitution and its Suspension Clause, courts in the United States applied the same approach. For example, in *Ex parte D'Olivera*, 7 F. Cas. 853 (C.C.D. Mass. 1813) (No. 3,967), a federal court in Massachusetts permitted an arrested noncitizen seaman to invoke habeas. In later years, the Supreme Court continued to hold that habeas was available to noncitizens – even excluded noncitizens stopped at the border. *United States v. Jung Ah Lung*, 124 U.S. 621, 628–32 (1888); *see also* Neuman, 98 Colum. L. Rev. at 1006. Cases throughout the finality era, from the 1890s to the 1950s, which carry significant weight here, held firm to this constitutional premise. In *Nishimura Ekiu v. United States*, 142 U.S. 651 (1892), the Court affirmed that despite the finality law, "[a]n alien immigrant, prevented from landing by any such officer claiming authority to do so under an act of congress, and thereby restrained of his liberty, is doubtless entitled to a writ of *habeas corpus* to ascertain whether the restraint is lawful." *Id.* at 660.

The Court continued that approach later in the finality era. *Gegiow v. Uhl*, 239 U.S. 3, 9 (1915) ("The courts are not forbidden by the [finality] statute to consider whether the reasons, when they are given, agree with the requirements of the act."). In *Gegiow*, for example, the Court reversed the government's legal conclusion that the petitioner was subject

to exclusion as a public charge based on a lack of labor opportunities in his immediate destination. *Id.* at 9–10; *see also Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 212–13 (1953) (stating that even though a noncitizen who had not entered the country lacks due process, he "may by habeas corpus test the validity of his exclusion"); *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 544 (1950) (addressing, but rejecting, noncitizen's "contention that the regulations were not 'reasonable' as they were required to be [under a federal statute]"). In *United States ex rel. Accardi v. Shaughnessy*, the Court granted habeas on legal grounds to a noncitizen who entered from Canada "without immigration inspection and without an immigration visa." 347 U.S. 260, 262, 268 (1954). In *Heikkila*, the Court explained that the Constitution was the source for habeas review during the finality era, 345 U.S. at 234–35, and in *St. Cyr*, the Court clarified that the Suspension Clause was the specific source of such review. *See* 533 U.S. at 304. Indeed, the government points to no alternative reading.

More broadly, the government offers no convincing reason to discount the finality era, nor does it offer a competing account of the common-law scope of the writ or of the finality era. The government, citing *Mezei*, 345 U.S. at 214, answers *Boumediene* step one by contending that Thuraissigiam, "as an alien apprehended immediately after crossing the border illegally, is no different from other aliens at the border, and is therefore 'assimilated to [that] status' for constitutional purposes." However, *Mezei* spoke only of such assimilation for the purposes of due process, and it otherwise *affirmed* the principle that habeas is available even when a petitioner lacks due process rights. *Id.* at 213. And, crucially, *Boumediene* never linked Suspension Clause rights to due process rights. The government provides no authority from

*Suspension Clause cases* to support its contention that Thuraissigiam lacks Suspension Clause rights. Because in the finality era the Court permitted even arriving noncitizens to invoke habeas review, we conclude that Thuraissigiam, who was arrested within the United States, may invoke the Suspension Clause.[19]

## C. Compliance with the Suspension Clause

Having concluded that Thuraissigiam may invoke the Suspension Clause, we must consider at *Boumediene* step two whether habeas review under § 1252(e) is so limited so as effectively to suspend the writ as applied to Thuraissigiam. At a minimum, the Suspension Clause "entitles the [petitioner] to a meaningful opportunity to demonstrate that he is being held pursuant to 'the erroneous application or interpretation of relevant law.'" *Boumediene*, 553 U.S. at 779 (quoting *St. Cyr*, 553 U.S. at 302).

Congress may modify the scope of habeas review so long as the review "is neither inadequate nor ineffective to test the legality of a person's detention." *Swain v. Pressley*, 430 U.S. 372, 381 (1977); *see Crater v. Galarza*, 491 F.3d 1119, 1124–25 (9th Cir. 2007) (noting, in the context of a challenge to AEDPA, that not all restrictions on habeas review effectively suspend the writ). We bear in mind that "[a]t its historical core, the writ of habeas corpus has served as a

---

[19] In so doing, we reject any argument that only noncitizens who have "been lawfully admitted" may invoke the Suspension Clause. Because the writ is an indispensable separation of powers mechanism, "[t]he test for determining the scope of this provision must not be subject to manipulation by those whose power it is designed to restrain." *Boumediene*, 553 U.S. at 765–66.

means of reviewing the legality of Executive detention, and it is in that context that its protections have been strongest." *St. Cyr*, 533 U.S. at 300–01; *see also Boumediene*, 553 U.S. at 783 (noting that in cases of executive detention, "the need for habeas corpus is more urgent"). Therefore, when evaluating whether a substitute is adequate, we consider "the rigor of any earlier proceedings" and "the intended duration of the detention and the reasons for it." *Id.* at 781, 783.

The government urges a different approach to step two. The government contends that Thuraissigiam's status matters to the extent of review the Suspension Clause requires. The government even suggests we should apply the *Boumediene* step one extraterritorial factors to determine whether § 1252(e)(2) provides sufficient review. However, those factors have no bearing on step two; only step one considers the petitioner's status. *See Boumediene*, 533 U.S. at 773–93 (considering, without any reference to Guantanamo detainees' status, whether the DTA was an adequate habeas statute by assessing "the sum total of procedural protections afforded to the detainee at all stages, direct and collateral"). Both logically and as applied in *Boumediene*, the circumstances relevant to step two – the extent of review the Suspension Clause requires – are those relating to the detainer, not the detainee. We also reject the government's contention that because, in its view, Thuraissigiam lacks due process rights, there are no rights for the Suspension Clause to protect. *Boumediene* foreclosed that argument by holding that, whether or not due process was satisfied, the Suspension Clause might require more. 553 U.S. at 785.

As a reminder, Thuraissigiam's petition contends that the government denied him a "fair procedure," "appl[ied] an incorrect legal standard" to his credible fear contentions, and

"fail[ed] to comply with the applicable statutory and regulatory requirements." The core of his claim is that the government failed to follow the required procedures and apply the correct legal standards when evaluating his credible fear claim. As Thuraissigiam's brief states: "Petitioner's claims merely assert his right to the meaningful credible fear procedure to which he is entitled under the immigration statute, regulations, and Constitution." We therefore consider whether the Suspension Clause requires review of those claims.[20] We conclude that the Clause requires such review in Thuraissigiam's case and that because § 1252(e)(2) fails to provide a meaningful opportunity for such review, it raises serious Suspension Clause questions.

At step two, the finality era again informs our analysis of what the Suspension Clause requires when a removal order is challenged. Finality era precedent establishes that the Court regularly reviewed on habeas "claims for statutory as well as constitutional error in deportation proceedings" and "claims

---

[20] Thuraissigiam's petition indicates that he might be asking a federal court to review the agency's credible fear determination, as he contends that he "can show a significant possibility of prevailing on his claims for asylum and other forms of relief." The government accordingly contends that Thuraissigiam's petition instead requests "ultimate application of a legal standard to factual determinations and weighing of evidence underlying the Executive's negative credible-fear findings." However, we read Thuraissigiam's petition to be explaining why, in his view, DHS' procedural errors matter, particularly given his express assertion that he only wants review of the procedural errors. We therefore do not consider here whether the Suspension Clause requires judicial review of DHS' credible fear determination on the merits. *Cf. Ortiz-Alfaro v. Holder*, 694 F.3d 955, 958 (9th Cir. 2012) (noting, based on *St. Cyr*, that "depriving [petitioner] the opportunity for judicial review of a determination that he lacks a reasonable fear of persecution could raise serious constitutional concerns").

that deportation hearings were conducted unfairly." *Flores-Miramontes*, 212 F.3d at 1143 (citing, *inter alia*, *Fong Haw Tan v. Phelan*, 333 U.S. 6, 8–10 (1948) (interpreting statute on habeas)); *Kessler v. Strecker*, 307 U.S. 22, 33–34 (1939) (same)).  In *Gegiow*, the Court also reviewed the executive's application of a legal standard to undisputed facts, concluding that the government had incorrectly determined that the petitioner was likely to become a public charge.  239 U.S. at 9–10.  Similarly, we have interpreted the nature of habeas review, encompassing inquiry into "the erroneous application or interpretation of statutes," *St. Cyr*, 533 U.S. at 302, to require that "mixed questions of fact and law – those involving an application of law to undisputed fact . . . be provided meaningful judicial review." *Ramadan v. Gonzales*, 479 F.3d 646, 652 (9th Cir. 2007) (per curiam).

Thuraissigiam and *amici* point us to other examples of the Court reviewing not just pure legal questions like the one at issue in *St. Cyr*, but also the application of a legal standard to undisputed facts.  *See, e.g.*, *Hansen v. Haff*, 291 U.S. 559, 562–63 (1934) (rejecting government determination that "petitioner's entry was for the purpose" of immoral relations); *Mahler v. Eby*, 264 U.S. 32, 44 (1924) (holding that the government failed to comply "with all the statutory requirements").  Those cases suggest that the Suspension Clause requires review of legal and mixed questions of law and fact related to removal orders, including expedited removal orders.

As in *Boumediene*, the decision to place a noncitizen in expedited removal and the finding of whether that noncitizen has a credible fear are both executive determinations, meaning that the requirements of habeas are "more urgent." *Cf. Boumediene*, 553 U.S. at 783.  While the duration of

Thuraissigiam's detention may seem to cut against review, the Court has recognized that an excluded person's "movements are restrained by authority of the United States." *Mezei*, 345 U.S. at 213. Moreover, "it would be difficult to say that [Thuraissigiam] was not imprisoned, theoretically as well as practically, when to turn him back meant that he must get into a vessel against his wish and be carried to [Sri Lanka]." *Chin Yow v. United States*, 208 U.S. 8, 12 (1908). The finality era cases also demonstrate that habeas is a viable means of reviewing exclusion and removal orders.

Most important, habeas review provides important oversight of whether DHS complied with the required credible fear procedures.[21] Under the existing administrative scheme, there are no rigorous adversarial proceedings prior to a negative credible fear determination. First, the credible fear interview is initiated only after the CBP officer identifies a noncitizen who fears persecution and refers that individual to a USCIS officer. *See* 8 C.F.R. § 235.3(b)(4); *see also* Refugee and Human Rights Amicus Br. 11–12. A noncitizen can consult with someone at his own expense before his asylum officer interview, but only as long as such consultation does not "unreasonably delay the process and is at no expense to the government." 8 C.F.R. § 208.30(d)(4). Before the IJ hearing, a noncitizen in expedited removal may

---

[21] Section 1252(e)(2) also restricts judicial oversight of whether the agency properly placed a person in expedited removal in the first place: "The troubling reality of the expedited removal procedure is that a CBP officer can create the § 1182(a)(7) charge by deciding to convert the person's status from a non-immigrant with valid papers to an intending immigrant without the proper papers, and then that same officer, free from the risk of judicial oversight, can confirm his or her suspicions of the person's intentions and find the person guilty of that charge." *Khan*, 608 F.3d at 329.

again consult with someone at his own expense, but the period to obtain such assistance is extremely abbreviated: an IJ "shall conclude the review to the maximum extent practicable within 24 hours" of the supervisory officer's approval of the asylum officer's determination. 8 C.F.R. § 1003.42(c), (e). Such review may take place "in person or via telephonic or video connection." Jaya Ramji, *Legislating Away International Law: The Refugee Provisions of the Illegal Immigration Reform and Immigrant Responsibility Act*, 37 Stan. J. Int'l L. 117, 134 –41 (2001). There is also no requirement that the IJ provide reasons for her decision. Indeed, in this case, the IJ simply checked a box on a form stating that the immigration officer's decision was "Affirmed."

These meager procedural protections are compounded by the fact that § 1252(e)(2) prevents any judicial review of whether DHS *complied* with the procedures in an individual case, or applied the correct legal standards.[22] We think it obvious that the constitutional minimum – whether Thuraissigiam was detained pursuant to the "erroneous interpretation or application of relevant law" – is not satisfied by such a scheme.[23] Our conclusion is bolstered by the Third

---

[22] One *amicus* brief describes reports that the agency does not always follow the required procedures. *See* Refugee and Human Rights Amicus Br. 16–27; *see also* Michele R. Pistone & John J. Hoeffner, *Rules Are Made to Be Broken: How the Process of Expedited Removal Fails Asylum Seekers*, 20 Geo. Immigr. L.J. 167, 175–93 (2006) (describing procedural errors commonly committed during the expedited removal process). If true, those reports only underscore the need for judicial review.

[23] A petitioner's perceived ultimate desire – as Judge Hardiman put it in *Castro*, to "alter their status in the United States in the hope of avoiding release to their homelands," 835 F.3d at 450–51 (Hardiman, J.,

Circuit's recent decision in *Osorio-Martinez*. As *Osorio-Martinez* put it, § 1252(e)(2) fails to provide "even [that] 'uncontroversial' baseline of review" required by *Boumediene*. 893 F.3d at 177. Because the statute prevented the district court from considering whether the agency lawfully applied the expedited removal statute, it *a fortiori* precluded review of "the erroneous application or interpretation of relevant law." *Id.* (citing *Boumediene*, 553 U.S. at 779). So too here, because § 1252(e)(2) prevents a court from reviewing claims of procedural error relating to a negative credible fear determination, it precludes review of the agency's application of relevant law and thus raises serious Suspension Clause questions.[24] Plenary power concerns cannot in all circumstances overwhelm the "fundamental procedural protections of habeas corpus . . . , a right of first importance." *Boumediene*, 553 U.S. at 798.

## IV.  The Canon of Constitutional Avoidance

We further decline to interpret § 1252(e)(2) to avoid the serious Suspension Clause problems engendered by the statute. The constitutional avoidance canon applies "if an otherwise acceptable construction of a statute would raise

---

concurring dubitante) – is not relevant where a petitioner challenges the fairness of specific procedures leading to an expedited removal order.

[24] Because Thuraissigiam's petition does not present the question, we do not consider one *amicus*' argument that "there is a compelling case for allowing habeas courts to review factual challenges to an expedited removal order." Scholars of Habeas Corpus Law Amicus Br. 18. "Generally . . . the court will not consider arguments raised only in amicus briefs." *United States v. Wahchumwah*, 710 F.3d 862, 868 (9th Cir. 2013) (citation omitted); *see also Russian River Watershed Prot. Comm. v. City of Santa Rosa*, 142 F.3d 1136, 1141 n.1 (9th Cir. 1998).

serious constitutional problems, and where an alternative interpretation of the statute is 'fairly possible.'" *St. Cyr*, 533 U.S. at 299–300 (citation omitted); *see also Ramadan*, 479 F.3d at 654 ("The Supreme Court has been careful to construe statutes in light of the Suspension Clause."). However, for us to apply the canon, the statute in question must be "susceptible of more than one construction." *Clark v. Martinez*, 543 U.S. 371, 385 (2005).

As explained at length above, we and other courts have consistently interpreted § 1252(e)(2) to foreclose review of claims like Thuraissigiam's. Section 1252(a)(2)(A)(i) precludes review of "any other cause or claim arising from or relating to the implementation of or operation of" an expedited removal order, which clearly bars claims relating to procedural error. We do not think the statute can bear a reading that avoids the constitutional problems it creates.

· ● ·

Therefore, we hold that § 1252(e)(2) violates the Suspension Clause as applied to Thuraissigiam, although we do not profess to decide in this opinion what right or rights Thuraissigiam may vindicate via use of the writ. The district court has jurisdiction and, on remand, should exercise that jurisdiction to consider Thuraissigiam's legal challenges to the procedures leading to his expedited removal order.

The judgment of the district court is **REVERSED** and the case is **REMANDED** for further proceedings consistent with this opinion.